445 So.2d 798 (1984)
Walter WILLIAMS, Jr.
v.
STATE of Mississippi.
No. 54294.
Supreme Court of Mississippi.
January 18, 1984.
Rehearing Denied February 29, 1984.
*801 Thomas E. Royals and Julie Ann Epps, Jackson, for appellant.
Bill Allain, Atty. Gen., by Amy D. Whitten and William S. Boyd, III, Sp. Asst. Attys. Gen., Jackson, for appellee.
EN BANC.
*799 PRATHER, Justice, for the Court:
Walter Williams, Jr., was indicted for capital murder while engaged in the crime *802 of robbery after the shooting death of a Jackson businessman. At the conclusion of the guilt-finding phase of the bifurcated trial, the jury returned a guilty verdict. The jury then determined that the only aggravating circumstance, i.e., that the crime was heinous, atrocious or cruel, outweighed any mitigating circumstances. As a result of that jury finding, the Circuit Court for the First Judicial District of Hinds County sentenced Williams to the death penalty. On appeal, the appellant raises seventeen assignments of error. We affirm the guilt phase; however, we reverse and remand for a new trial on the sentence phase.

FACTS
Walter Williams is a black man in his thirties. His mental capabilities are described as being between the ranges of mentally retarded and dull-normal, with an intelligence quotient of 84. Since the age of nine, he worked intermittently for Venus Ainsworth at the Ainsworth Furniture Store in Jackson, performing odd jobs. Their relationship was described as good. Ainsworth loaned money to Williams when he needed it, and Williams worked out his debts at the store.
On August 4, 1981, Williams borrowed an R G .38 caliber revolver from another Ainsworth employee who handled the store collections. That employee, Dwight Shows, described his pistol as being capable of holding six rounds of shells, but that it was only loaded with five shells when loaned to Williams. Williams allegedly borrowed the gun because an ex-girlfriend was annoying him.
During the week prior to the killing, Williams worked two days for Ainsworth, but he had not been paid. The store procedure was to pay on Saturdays. On Saturday, August 15, 1981, Williams was living with a girlfriend, Mary Hutchinson and her two children. Two other over-night guests, Peggy Smith and Barbara Walters, were also present.
At about 4:00 a.m., on August 15, Mary Hutchinson witnessed Walter Williams removing a pistol from underneath the mattress before leaving the house. She asked Williams for $5.00, but he stated that he had no money to give her; however, he was going to collect his check later that day. Williams returned home once, but left again about 6:00 a.m. in the direction of downtown Jackson.
William Piggs, an acquaintance of Walter Williams, was in downtown Jackson, and in view of the rear entrance of the Ainsworth Furniture Store on that early morning. Hearing several gunshots, he looked toward the furniture store and saw Walter Williams at the rear entrance standing over Venus Ainsworth.
Williams picked up something that looked like a briefcase and ran with a gun in his right hand. Relatives later revealed that Mr. Ainsworth, by habit, carried large amounts of cash money in a metal box and in his wallet to work every morning. Moreover, since Mr. Ainsworth had been shot and robbed twice before, he customarily carried a pistol for protection, along with a small pocketknife.
The police arrived at the Ainsworth Furniture Store at about 6:34 a.m. finding Ainsworth dead near the rear entrance.
Meanwhile, after the shooting, Williams first visited his mother's house at approximately 8:00 a.m. and left an RG .38 gun in the cedar chest at her home. Later, at about 8:15 a.m., he arrived at the home of his friends, James Lee Williams (no relation) and James Lee's mother, Rosie Williams. At this time he had with him a Smith and Wesson gun which he tried to sell to James Lee for $15.00. Williams decided not to sell the gun, but left it with James Lee for safekeeping.
James Lee and another friend then drove Williams to the Jackson Mall. On the way Williams discussed buying a car for $500 to $600. Following this conversation, James Lee left Williams at the Mall. After making several purchases, the defendant took a cab home.
At 10:00 a.m., Williams arrived back at his own residence. He had in his possession *803 new clothing (black ankle boots, black hat, slacks and shirt, and underwear), which was purchased for a total sum of $105.00. In addition, he had about $45.00 in cash and a pocketknife. The police arrived at Williams' house just after his arrival, and Williams was asked to come to police headquarters for questioning.
At police headquarters, Williams responded voluntarily as to his whereabouts between 6:00 a.m. to 6:30 a.m. that day. His story was that he had spent the night at his mother's home and had returned to his own home at about 7:00 a.m. that morning. When asked about the RG .38 caliber revolver that he borrowed from Shows, Williams responded that the pistol had been stolen by his nephew. Williams then authorized a search of his home by the police. The search, at about 11:40 a.m., resulted in the seizure of the new purchases of clothing, the pocketknife, and the $45.00 in cash. Moreover, Mary Hutchinson refuted Williams' statement that he had spent the night at his mother's home, stating that he had slept with her.
Arcola Williams, the defendant's mother, was also visited by the police, and she consented to a search of her home. The search resulted in the seizure of the RG .38 caliber revolver and some ammunition from the cedar chest. After this search, the police decided to question Williams a second time. This time, Williams was asked to explain the new purchases of clothing and the cash. His response revealed that a woman had given him $35.00 and that he had sold aluminum cans for an additional $17.00. The cash for the clothing purchase was not fully accounted for.
Williams then decided to provide a statement that detailed his presence at Ainsworth's store while having an argument with Mr. Ainsworth about competing with the store in the sale of used appliances. Ainsworth was said to have pulled a gun on Williams as the discussion continued. According to this statement, Ainsworth demanded that Williams return the pistol that was borrowed from Shows. Williams refused, but added that he would give it back to Shows. Upon that refusal, Ainsworth allegedly threatened to call the police and became very upset. Williams stated: "Mr. Ainsworth's hands were shaking and he reached up and he pulled the hammer back on his pistol which he was holding on him." Williams then admitted that he immediately pulled out the Dwight Shows pistol, shot Ainsworth one time, and then fled. However, he denied any robbery of Ainsworth's knife, gun or money.
A subsequent story by Williams led to the recovery of Ainsworth's pistol at James Lee Williams' home. The denial by Williams of any robbery has, however, persistently been maintained.
Turning now to the investigation of the victim immediately after the shooting, the police found Ainsworth's body face down near the rear door of the store. Ainsworth's right pants pocket was turned inside out. Although Williams told the police in one statement that Ainsworth had pulled his Smith and Wesson pistol out of his right pocket, the police actually found a set of keys in Ainsworth's right hand. The back side of Ainsworth's trousers, socks, and shoes, evidenced dust particles. Furthermore, one of Williams' statements added the fact that, after shooting Ainsworth once, Ainsworth had attempted to catch Williams' trouser leg.
Dr. Rodrigo Galvez performed the autopsy on Ainsworth. He observed four gunshot wounds on the victim's body  one in the top of the head, one in the back of the head, one in the left temple, and one in the chest. A fifth bullet was found in the wall by the doorway to the furniture store. Dr. Galvez expressed the opinion that Ainsworth could have lived no longer than fifteen minutes after suffering from such severe wounds, and he concluded that the cause of Ainsworth's death was the gunshot wounds to either the back of the head or the temple.
A ballistics expert testified that none of the bullets in Ainsworth's body or in the wall could have come from Ainsworth's Smith and Wesson gun; instead, all the *804 bullets were positively matched with the pistol that Williams borrowed from Shows.
Defendant assigns as error the following:

THE PRETRIAL PHASE
I. The indictment is void for failing to allege the statutory aggravating circumstances.
II. The trial court erroneously excluded juror Odom in violation of the requirements of the United States Supreme Court for selecting jurors in death penalty cases.

THE GUILT/INNOCENCE PHASE
III. Appellant's conviction must be reversed because of the variance between the proof and the indictment with regard to the ownership of the property.
IV. Conduct of the District Attorney constitute reversible error in the examination of witness Barfield.
V. & VI. The trial court erred in granting State's Instruction Numbers 1 and 2.
VII. The trial court erred in the guilt phase in refusing Defendant's circumstantial evidence instruction.
VIII. Improper comments by the prosecutor in closing argument on the guilt/innocence phase.
IX. The verdict of the jury in the guilt phase is against the overwhelming weight of the evidence and is not supported by the evidence.
The assigned errors from the sentencing phase will be addressed later.

LAW

THE PRETRIAL PHASE

I.
In his first assignment of error, the appellant contends that the indictment should have informed him of the aggravating circumstances intended to be relied upon by the state so that a defense could be more adequately prepared. We note that, under section 99-19-101(5) of the Mississippi Code Annotated (Supp. 1982), no more than eight listed aggravating circumstances may be potentially introduced against a defendant found guilty of murder.
Several jurisdictions have considered this question, and the consensus is that the indictment does not have to inform the accused of the aggravating circumstances intended to be relied upon by the prosecution. See, e.g., Federal: Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979); Mitchell v. Hopper, 538 F. Supp. 77 (S.D.Ga. 1982); Florida: Sireci v. State, 399 So.2d 964 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982), reh. denied, 458 U.S. 1116, 102 S.Ct. 3500, 73 L.Ed.2d 1378 (1982); Georgia: Goodwin v. Hopper, 243 Ga. 193, 253 S.E.2d 156 (1979), cert. denied, 442 U.S. 947, 99 S.Ct. 2896, 61 L.Ed.2d 319 (1979); Missouri: State v. Trimble, 638 S.W.2d 726 (Mo. 1982); Texas: Amanda v. State, 640 S.W.2d 766 (Tex. App. 1982). However, some states do have statutes which require such notice. See, e.g., Wilson v. State, 371 So.2d 932 (Ala.Cr.App. 1978), aff'd, 371 So.2d 943 (Ala. 1979), vacated, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1133 (1980), on remand, 405 So.2d 696 (Ala. 1981). In Mississippi, we have no such statutory requirement.
The major purpose of an indictment is to furnish the accused such a description of the charges against him as will enable him to adequately prepare his defense. Westmoreland v. State, 246 So.2d 487 (Miss. 1971); Woods v. State, 200 Miss. 527, 27 So.2d 895 (1946). Thus, all that is required in this regard is a concise and clear statement of the elements of the crime charged. Love v. State, 211 Miss. 606, 52 So.2d 470 (1951). Nothing more is required.
We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty *805 statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. In our opinion, Williams received adequate notice.[1]

II.
The appellant's next contention is that the trial judge erred in sustaining the state's challenge of potential juror Odom for cause because Odom expressed reservations about the death penalty. In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court clearly set forth the criteria upon which a challenge for cause of this nature may be sustained. A sentence of death cannot be executed if the jury was chosen by excluding potential jurors for cause simply because they voiced general objections or conscientious scruples against the death penalty. Instead, the state is permitted to exclude potential jurors only if (1) they would automatically vote against capital punishment without regard to the law and the evidence, or (2) their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. 391 U.S. at 522-23, 88 S.Ct. at 1776, 20 L.Ed.2d at 784.
During voir dire, Ms. Odom specifically stated that her ability to determine guilt or innocence would be affected by her personal attitude toward the death penalty. Furthermore, she added that she was opposed to the death penalty under any circumstances. These remarks clearly justified the sustaining of the challenge for cause.

THE GUILT PHASE

III.
In his next assignment of error, Williams contends that there was a fatal variance between the proof and the indictment as to the ownership of the stolen property. While the indictment alleged that the defendant stole the personal property of "Venus Ainsworth d/b/a Ainsworth Furniture Company," the proof established that the property belonged in part to the corporation, Ainsworth Furniture Company, Inc., and in part to Venus Ainsworth, individually.
Our review of the record shows that defense counsel simply allowed the introduction of the evidence in question without any objection. We have consistently followed the rule that a specific and contemporaneous objection is required to permit consideration on appeal of any issue involving a variance between the proof and the indictment. See, e.g., Banks v. State, 394 So.2d 875 (Miss. 1981); Lay v. State, 310 So.2d 908 (Miss. 1975); Ellis v. State, 254 So.2d 902 (Miss. 1971); Pieratt v. State, 235 So.2d 923 (Miss. 1970). The reasons for this rule are obvious, and its application is necessary even in death penalty cases. Accordingly, we are barred from addressing this issue on its merits.

IV.
Williams next asserts that a mistrial should have been granted when a prosecution witness testified about the appellant's decision to remain silent during a police interrogation. According to Officer T.C. Barfield's testimony, the appellant's response to an inquiry concerning the police's seizure of Shows' gun was that "he wanted to see his attorney" and that "he had nothing further to say."
Defense counsel's immediate objection was based solely on the ground that *806 the testimony involving the appellant's request for an attorney was inadmissible evidence and prejudicial. That objection was also followed by a motion for mistrial, and an alternative request for an instruction directing the jury to disregard the same remark. However, there was never any objection at trial regarding the remark that Williams "had nothing further to say."
We are required to consider only that portion of the assignment of error which is related to the specific objection made in the court below. Tokman v. State, 435 So.2d 664 (Miss. 1983). Accordingly, defense counsel's inaction concerning the "nothing further to say" testimony renders inappropriate our consideration of that issue on the merits. The specific ground or grounds for an objection must be pointed out to the lower court so that timely remedial action, if necessary and possible, can be provided. Here, defense counsel never gave the lower court a chance to act on that particular point.
We also believe that any error resulting from the officer's testimony about Williams' request to see an attorney was timely cured by the trial judge's admonitions to the jury. The objection was sustained and the trial judge additionally instructed the jury to disregard Officer Barfield's statement about the request for an attorney. Moreover, the jury nodded affirmatively when asked if it could disregard the remark. The jury is presumed to have followed those directions by the judge. Evans v. State, 422 So.2d 737 (Miss. 1982).

V

(A).
The appellant also contends that State's Instruction No. 1 was improperly granted by the trial court since it was at variance with the indictment. While the indictment charged Williams with taking a blue metal money box, a billfold, and some money, the instruction directed the jury to determine whether Williams took the box, the billfold, the money, or anything of value. The "anything of value" language was apparently based on evidence which indicated that Ainsworth's gun and pocketknife were taken during the crime.
In Sisk v. State, 260 So.2d 485 (Miss. 1972), this Court considered the propriety of granting an instruction which did not conform to the issues raised by the indictment. The indictment charged the accused with wilfully defrauding another. But, the instruction in question charged the jury to determine whether the defendant "wilfully defrauded or attempted to defraud" another. The Court correctly determined that there was a material variance in the "attempt to defraud" language and concluded that it was error to grant the instruction. Id. at 487.
The Sisk v. State decision comports with the general rule followed in many jurisdictions. That is, instructions must be confined to the issues raised by the indictment. State v. Daugherty, 631 S.W.2d 637 (Mo. 1982); State v. Sugimoto, 62 Haw. 259, 614 P.2d 386 (1980); Russo v. State, 234 So.2d 19 (Fla.App. 1970); 23A C.J.S. Criminal Law § 1311 (1961). However, a variance must be material to accurately categorize an instruction as error. People v. Foster, 59 Ill.Dec. 145, 431 N.E.2d 430, 103 Ill. App.3d 372 (1982); State v. Singleton, 602 S.W.2d 3 (Mo. App. 1980).
In this case, we have the latter situation. State's Instruction No. 1 did not materially vary from the charge alleged in the indictment. It did not accuse Williams of a crime separate and distinct from that stated in the indictment. Nor did it refer to alleged facts of which Williams had no notice. He directed the police to the location of Ainsworth's gun. Furthermore, the pocketknife was seized from Williams' house, and it was the subject of discussion during an interrogation. In our opinion, Williams was in no way surprised by the introduction of these items into evidence. There was no objection lodged with the court when the gun was introduced into evidence. Nor was there any objection to the pocketknife due to a variance with the *807 indictment. We conclude that there is no merit to this assignment because there was no material variance between the indictment and the instruction.

(B.)
In this same assignment of error, Williams contends that State's Instruction No. 1 was also erroneous for permitting the jury to convict him of capital murder regardless of whether he actually intended to do any killing. In making this argument, the appellant relies solely on Enmund v. Florida, 458 U.S. 782, 788-89, 102 S.Ct. 3368, 3372, 73 L.Ed.2d 1140, 1146 (1982).
Enmund was sentenced to death for participating in a robbery which ultimately led to the murder of two elderly people. His role was simply to drive the get-away car. He had no other participation in the murder or robbery. The United States Supreme Court ruled that it was improper to impose the death sentence, in the absence of proof, on one who did not himself kill the victim, or attempted to kill, or intend to kill the victim.
Walter Williams' actions clearly did not meet the criteria stated above. He admitted shooting Ainsworth to the police, and therefore, this case is factually distinguishable. The Enmund decision does not say that all four elements stated above must be present before the death sentence can be imposed. All that it requires is that any one of the elements above exists. This contention is simply without merit.

VI.
The appellant next contends that the trial judge improperly granted State's Instruction No. 2[2] because the instruction failed to inform the jury of the necessity that it find that Williams had the intent to rob when the act of killing was done. However, when the instruction was offered by the prosecution during trial, defense counsel objected to the use of the "anything of value" language in the instruction and to the alleged peremptory wording of the instruction. The basis of the objection relied upon on appeal is therefore, a new and different ground than those stated at trial.
Generally, it is the rule of this Court that no assignment of error involving the giving of an instruction to the jury will be considered on appeal unless a specific objection to the instruction was made in the court below. Miss.Sup.Ct.Rule 42. Moreover, the ground relied upon in the assignment of error should be one of the grounds stated in the objection to the lower court. Minor v. State, 379 So.2d 495 (Miss. 1979); Entrican v. State, 309 So.2d 851 (Miss. 1975). Perhaps, the best single explanation of the principles undergirding Rule 42 is stated in Rayburn v. State, 312 So.2d 454 (Miss. 1975), wherein the Court stated:
It is essential that specific objections to instructions be made to the trial judge, in order that errors and omissions may be corrected or supplied before any possible harm can result. A defendant may not tacitly reserve an objection at that point, or wait until after a guilty verdict is returned, meanwhile having availed himself of the chance to be acquitted, or *808 call attention to an omission or error for the first time on appeal in order to have his conviction set aside.
[Id. at 455].
To further the practice of what we consider to be an important and necessary rule, we decline to address this issue on its merits for it is procedurally barred.

VII.
One of Williams' principal contentions is that the prosecution was not required to establish his intent to rob Ainsworth with sufficient evidence to exclude every reasonable hypothesis other than that of guilt. Or, in other words, Williams desired a circumstantial evidence instruction since the proof of his intent was entirely circumstantial. The burden of proof instruction which was actually granted at trial simply required the prosecution to prove Williams' guilt beyond a reasonable doubt.
Ordinarily, if one element of the crime essential to the conviction of the defendant is established by circumstantial evidence, it is necessary that it be proven to the exclusion of every reasonable hypothesis consistent with that of innocence. Gilleylen v. State, 255 So.2d 661 (Miss. 1971); Love v. State, 208 So.2d 755 (Miss. 1968). The reason for this requirement is that it is only the exclusion of every reasonable hypothesis other than that of the guilt of the accused that invests mere circumstances with the force of proof. Simmons v. State, 106 Miss. 732, 64 So. 721 (1914); Haywood v. State, 90 Miss. 461, 43 So. 614 (1907).
However, the courts from various jurisdictions have treated proof of the intent element differently. Where the intent element is the only element proven entirely by circumstantial evidence, no charge on circumstantial evidence is necessary. See, e.g., Delaware: Brown v. State, 233 A.2d 445 (Del. 1967); Georgia: Reddick v. State, 11 Ga. App. 150, 74 S.E. 901 (1912); Iowa: State v. Moehlis, 250 N.W.2d 42 (Iowa 1977); Missouri: State v. Malconry, 270 S.W. 375 (Mo. 1925); Texas: Davis v. State, 516 S.W.2d 157 (Tex.Cr.App. 1974). The reason for this rule is that where intent is the only element proven by circumstantial evidence, at least some positive or direct evidence was necessarily relied upon to prove the other elements from which the guilty intent was inferred. Thus, proof of intent in those situations is not entirely circumstantial.
In the instant case, the only element proven entirely by circumstantial evidence was that of intent. This Court has held that unless the case against the defendant is purely or wholly circumstantial the defendant is not entitled to a circumstantial evidence instruction. Bullock v. State, 391 So.2d 601 (Miss. 1980), Edwards v. State, 413 So.2d 1007 (Miss. 1982). Thus, it was proper to refuse the appellant's request for a circumstantial evidence instruction.

VIII.
In his closing argument, the prosecutor said: "If someone walked up to you after trial and said: `Do you tell me that you acquitted that man?' `Yes, because they said it was self-defense.' Then you tell that person and explain to yourself as I ask you, are you looking for an excuse or reason?" Counsel for the defendant objected to this line of argument and the objection was sustained. The prosecutor then returned to the same line of argument by stating: "Then you ask yourself, did I turn that person loose and... ." Defense counsel immediately objected once again and his objection was sustained. Finally, the prosecutor attempted one more time to follow up on the same line of argument when he stated: "Can you tell me that you can go back there in that jury room ..." This time, defense counsel immediately interrupted and moved for a mistrial, but his request was overruled. The prosecutor then moved on to a different line of argument.
The statements by the prosecutor were improper and the trial court properly sustained every objection. The purpose of a closing argument is to fairly sum up the evidence and to point out those facts *809 presented by the state on which the prosecution contends a verdict of guilty would be proper. Clemons v. State, 320 So.2d 368 (Miss. 1975). Counsel "cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence." Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817, 821 (1930). The prosecutor's remarks had nothing to do with the evidence presented during the case, nor with any reasonable conclusions or inferences from the evidence presented in the case.
However, the question before us is whether the remarks require a reversal of the trial decision and a remand for a new trial. We believe that the action of the trial court in sustaining defense counsel's objections to the remarks were sufficient to prevent reversible error. Holifield v. State, 275 So.2d 851 (Miss. 1973). Furthermore, if counsel thought it necessary, he could have requested the trial judge to admonish the jury to disregard the prosecutor's remarks. Counsel obtained everything he asked for within reason.

IX.
The appellant's final contention concerning the guilt phase is that the verdict of guilt was against the overwhelming weight of the evidence. More specifically, Williams argues that the evidence was insufficient to establish that he possessed the intent to rob Ainsworth during the time of killing Ainsworth.
A jury verdict of guilty cannot be set aside by this Court unless it is clear that the verdict was the result of prejudice, bias, or fraud; or that it was manifestly against the weight of the evidence. Pate v. State, 419 So.2d 1324 (Miss. 1982). Clearly, there was both direct, as well as circumstantial evidence, which established that Williams took property belonging to Ainsworth and the store during the admitted shooting of Ainsworth. We might also add that the evidence fails to indicate any other motive for the killing other than a desire for money.
In our opinion, a jury could rationally conclude, based upon such evidence, that the killing was committed with the intent to rob. Intent may be shown by the acts of the defendant as well as by the circumstances surrounding those actions. It is simply not necessary to establish the mental state of intent by direct evidence. Voyles v. State, 362 So.2d 1236 (Miss. 1978). The jury's verdict of guilt was not against the overwhelming weight of the evidence; in fact, the verdict was supported by the weight of the evidence. We find no reversible error in the guilt phase.

THE SENTENCE PHASE
Numerous errors assigned during the sentence phase of this trial may be summarized as follows:
X. The prosecutor's error in (1) his comment on the number of automatic appeals that the defendant would receive, (2) on the defendant's failure to testify, and (3) the questioning of Dr. Guild about parole provisions;
XI. The exclusion of evidence of mitigating circumstances that the jury may consider;
XII. The instructions granted and refused by the court;
XIII. The jury's verdict;
XIV. The cumulative effect of all these errors, and
XV. The constitutionality of our death penalty statute.
We have considered all assigned errors, and conclude that the sentence phase must be reversed and remanded for a new trial. Our discussion here will be limited to those assigned errors necessary to reach this conclusion, and our decision is based upon Mississippi jurisprudence. Also, the constitutionality of our death penalty statute has been addressed in our prior cases. Bullock v. State, 391 So.2d 601 (Miss. 1981). See also, Gray v. Lucas, 677 F.2d 1086, (5th Cir.1982).
*810 As we move to a consideration of the sentencing phase, three premises need to be made clear.
First, the sentencing phase is a separate trial. Even though the proceedings at the guilt phase be error free, we start anew at the sentencing phase. If we find error there, we reverse on that phase only. Cf. Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 402 (1977) Presnell v. Georgia, 439 U.S. 14, 16, 99 S.Ct. 235, 236, 58 L.Ed.2d 207, 211 (1978); Voyles v. Watkins, 489 F. Supp. 901, 912 (N.D.Miss. 1980); and Jones v. Thigpen, 555 F. Supp. 870, 878-879 (S.D.Miss. 1983).
Second, this Court has an established practice in capital cases of considering trial errors for their cumulative impact. In setting aside a guilty verdict and sentence of death in a murder case, Russell v. State, 185 Miss. 464, 189 So. 90 (1939), holds:
It is true that no one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is our view that they resulted in the appellant being denied a fair trial ...
[185 Miss. at 469, 189 So. at 91].
This practice of considering errors for their aggregate effect on the fairness of the proceedings below has recently been followed by the Court in a non-capital case. Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982).
Third, we have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interests of justice so require. Culberson v. State, 379 So.2d 499, 506 (Miss. 1980) (Rule 42 waived "with reluctance and only because this is a capital case."); Bell v. State, 360 So.2d 1206, 1215, 1217-1218 (Miss. 1978).
All three of these premises are ultimately rooted in our awareness of the uniqueness and finality of the death penalty. Because the penalty is different in quality and severity, so is the nature of our review responsibility. We stated in Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978):
We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. (Citation omitted) What may be harmless error in a case with less at stake becomes reversible error when the penalty is death. .. .
See also, Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982) Gipson v. State, 203 Miss. 434, 437, 35 So.2d 327, 328 (1948).

X.
Williams contends that reversible error occurred when, during closing argument, the prosecution commented on the "eight automatic stages of appeal" that the appellant Williams would have the opportunity to pursue. There was no contemporaneous objection to the prosecutor's closing argument at the time the remark was made during the trial in June, 1982. Williams now assigns this remark as error based upon our opinion in Howell v. State, 411 So.2d 772 (Miss. 1982), decided March 24, 1982, which announced the rule that reversible error was committed where a prosecutor injected into closing argument the idea that any error of the jury would be corrected on appeal, and where the jury was not informed that they were the only factfinders, not the appellate court.
We have long held that unwarranted and improper remarks of a district attorney would warrant reversal where there was a "most extreme and intolerable abuse of his privilege", even without defendant attorney's objection. Cartwright v. State, 71 Miss. 82, 14 So. 526 (1893), Powers v. State, 83 Miss. 691, 36 So. 6 (1904), Regan v. State, 81 Miss. 422, 39 So. 1002 (1906), Bufkin v. State, 134 Miss. 116, 98 So. 455 (1924). Even though Williams failed to contemporaneously object at trial, he assigned this error on appeal, and we consider it in the context of the three premises just stated.
Our recent decision in Hill v. State, 432 So.2d 427 (Miss. 1983) addressed the problem *811 of closing arguments which attempt to lighten the burden on a jury in deciding a life or death issue. The opinion states:
The argument made by the prosecuting attorney to the jury that their verdict was not the "last word" was clearly erroneous and would ordinarily be considered highly prejudicial ... in a death penalty case a jury should never be given false comfort that any decision they make will, or can be, corrected. [432 So.2d at 439].
Our powers of appellate review in death penalty cases has been severely limited both as a matter of law and in actual practice.
As a matter of law, we are in essentially the same posture as on any other occasion when we are called upon to review a jury's verdict. If the verdict is supported by substantial evidence, we leave it alone.
For example, section 99-19-105(3)(a) mandates that we review any death sentence to determine whether it has been "imposed under the influence of passion, prejudice, or any other arbitrary factor." This is the same test we apply in any criminal case in determining whether we should order a new trial on the grounds that the verdict was against the overwhelming weight of the evidence. See, e.g., Quarles v. State, 199 So.2d 58, 61 (Miss. 1967); Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983). It is rare that we invoke this power to order a new trial.
Section 99-19-105(3)(b) requires us to review any death sentence to determine whether there is evidence in support of the jury's finding of a "statutory aggravating circumstance." This is nothing more than the familiar test we apply when a defendant argues here that the trial judge should have entered a judgment of acquittal notwithstanding the verdict of the jury. See, for example, Gandy v. State, 438 So.2d 279, 284-285 (Miss. 1983). Our power to interfere with the jury's verdict here is even more restricted than under the new trial test of section 99-19-105(3)(a). See Mister v. State, 190 So.2d 869, 871 (Miss. 1966).
Finally, we are required to perform what has come to be known as "proportionality review" to determine:
[W]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
[Mississippi Code Annotated §§ 99-19-105(3)(c)]
Our experience in the review of death sentences under this section makes it clear that reversal will be extremely rare. Out of twenty-five death penalty cases decided here since the proportionality review statute has been in place, only two have resulted in the sentence being vacated on this ground. Coleman v. State, 378 So.2d 640 (Miss. 1979); and Edwards v. State.
Therefore, we emphasize that the jury's verdict at the sentencing phase is the single most important stage of the process of determining whether the defendant will live or die. The appellate court's role is secondary and subordinate, and our power to review is severely limited as a matter of law.
In this context we consider the State's suggestion that we delineate what is proper argument on the subject of appellate review. We have the constitutional power to choose from several alternatives. We may allow argument to be made on this subject, so long as what is said is accurate and correct. California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), or we have the power to prescribe a model jury instruction covering this subject if we thought it appropriate to do so. See Newell v. State, 308 So.2d 71, 78 (Miss. 1975), but, it is our considered judgment that we should exercise this power by proscribing such argument altogether.
The structure of the capital sentencing system enacted by our Legislature places the entire sentencing burden on the jury. No judge or other official within our system has the power to impose the sentence of death; only the jury. Therefore, if under our system the capital sentencing jurors are allowed to consider or speculate *812 that any death verdict they may return may later be vacated on appellate review can only have the effect of lessening the sense of responsibility our law has devolved upon them.
Sentencing a citizen to death is the responsibility vested by law in our juries. Any matter presented to such jurors which would allow them to shift their awesome responsibility to others is simply contrary to our law. That we have limited powers of appellate review in no way changes the fact that the primary and ultimate sentencing power is vested alone in the jury. We hold, therefore, that no argument may be made to the jury regarding appellate review or any other matter which might reasonably be expected to cause a juror to consider that he or she shares with anyone other than his or her eleven fellow jurors the responsibility of determining whether the defendant will be sentenced to death.
We have held this reversible error in a non-capital case, Howell v. State, supra. It follows, under the premises outlined at the beginning of our consideration of the sentencing phase, that such is surely error in a death penalty case.
A related point need also be made clear. The defendant does not "invite" comment on appellate review by reminding the jury that it is the legally constituted authority for deciding whether the defendant will live or die. Within the structure of our capital sentencing system, the jury does in fact and in law decide whether the defendant lives or dies. Both prosecutors and defense counsel in final argument to the jury at the sentencing phase should focus on the decision the jury is charged by law with making  whether the defendant will live or die.
Hill v. State, 432 So.2d 427 (Miss. 1983) is in no way contrary to what we say here. Our reversal here is based upon the cumulative effect of three points mentioned here, not solely upon the appellate review argument. And, even though Hill held under the facts of that case that this point was procedurally barred, Hill also made clear:
(a) that the rule of Howell v. State, 411 So.2d 772 (Miss. 1982) "applies to arguments at the sentencing phase of capital murder trials," 432 So.2d at 439, and
(b) that any prosecutor making this sort of argument is asking for a mistrial, 432 So.2d at 439.
Caldwell v. State, 443 So.2d 806 (Miss. 1983), is distinguishable in the following respects:
(a) the appellate review point was the only error at sentencing, where here it is combined with two others;
(b) the point was not assigned as error on appeal, while here it was;
(c) in any event, it is not appropriate for a four-four decision as in Caldwell to establish precedent in the law on an important issue in capital murder litigation.

XI.
Another assignment concerns the prosecution's cross-examination of a psychiatrist about parole and probation provisions. During the direct examination, Dr. Donald Guild made the following response to an inquiry concerning Williams' changing accounts of the murder incidents:
A. [By Dr. Guild]
Well, if you were charged with a crime that might wind up in the death penalty or in thirty years in prison, I would say that a lot of people had the tendency to lie. In fact, it would be more the rule than the exception, at least from my experience.

[Emphasis added].
Subsequently, the prosecution expanded on Guild's unelicited comment during cross-examination in the following manner:
Q. [By prosecutor]
And what you said that he's facing either death or thirty years. Where do you come up with thirty years?
[Emphasis added].
A. [By Dr. Guild]
Well, it's been my understanding that a life sentence is usually thirty years, *813 which would be the alternative to the death penalty.
Q. I see. And thirty years is what he would have to serve?
A. (Pause)
Q. Is that your understanding?
A. Well, I don't know. The Department of Corrections has so many different programs now. I think the last time I saw anything from them, there was a list of about eight options. Supervised probation, shock probation, earned release, parole, probation and there was a whole lot of ways that you can get out of the penitentiary besides escape or serving your sentence. So, really, a life sentence could go anything from zero to thirty years, I guess, but, as I remember it, thirty years is the top.
Q. So, you were saying, then, that he's facing at most with a life sentence thirty years or the death penalty. Is that right?
A. That's my understanding.
Q. And that's if he doesn't get parole, probation and all the other options 
We reject the state's argument that the defense invited this line of cross-examination. The significance of the term thirty years was not evident to the jury until the prosecutor made it quite clear. The expansion of the witness's response was totally unnecessary by the prosecutor, and it constituted error. Martin v. State, 415 So.2d 706 (Miss. 1982); Hartfield v. State, 186 Miss. 75, 189 So. 530 (1939); Abney v. State, 123 Miss. 546, 86 So. 341 (1920); Minor v. State, 101 Miss. 107, 57 So. 548 (1912). A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Mississippi Code Annotated section 47-7-3(1) (Supp. 1982). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. Johnson v. State, 416 So.2d 383, 392 (Miss. 1982).
Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, 677 (1979); Davis v. State, 429 So.2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).
A third matter that concerns us is whether the prosecution improperly commented on Williams' failure to offer sworn testimony subject to cross-examination. See Mississippi Code Annotated section 13-1-9 (1972) (failure of accused to testify shall not operate to his prejudice or be commented on by counsel); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).
A review of the record is in order here. During the guilt/innocence phase, two written statements signed by Williams were introduced by Officers Barfield and Jordan, that asserted Williams' killing was in self-defense. Officer Barfield orally testified also as to Williams' claim of self-defense as justification for the killing. The defendant did not testify in the guilt/innocence phase of the trial, but asked and was permitted to make an unsworn opening statement to the jury during the sentencing phase with proper court admonitions. His *814 remark to which objection was made by the state was:
"Have you ever had a gun pointed at you that misfired?"
Then, in closing argument, the prosecution commented to the jury, in unfavorable terms, about the appellant's failure to give his version of the facts while under oath and subject to cross-examination. The record of the guilt phase does reflect Williams' claim of self-defense. It does reflect that Ainsworth had a gun, but there is no support in the guilt phase record for his comment that Ainsworth pointed a gun at him which misfired.
In Jones v. State, 381 So.2d 983 (Miss. 1980), this Court considered the possibility of a waiver of immunity from self-incrimination by a defendant who gives an unsworn statement on points which are not introduced into the record. Jones, a defendant in a capital murder trial, attempted to interject during an unsworn statement that there were four, rather than three, persons involved with the crime. That was considered to be a material point without foundation in the record. Accordingly, the prosecution was permitted to comment "to the jury that the defendant's statements were not given under oath and that he was not subject to cross-examination about them." Id. at 993.
This is one of those close questions which calls to mind our long-standing policy that in capital cases we resolve doubtful legal questions in favor of the accused. Gambrell v. State, 92 Miss. 728, 736, 46 So. 138 (1908). It is particularly appropriate that we adhere to this policy in cases where doing so will only result in remand for a new sentencing phase hearing where the state will be free once again to seek the death penalty.
It is not necessary to hold that the instant error standing alone constitutes reversible error. Rather, we hold that on the record before us there is the substantial possibility that the sentence of death was imposed under the influence of passion, prejudice and other arbitrary factors. Mississippi Code Annotated section 99-19-105(3)(a) (Supp. 1982). This influence we find in a combined consideration of the three errors of: (a) appellate review (b) possibility of parole, and (c) comment on Williams' failure to testify. As in Russell v. State, 185 Miss. 464, 189 So. 90 (1939), it may be true that none of these errors considered above would require reversal, but when they are considered as a whole for their aggregate effect, it becomes clear that Williams was denied a fair sentencing hearing. 185 Miss. at 469, 189 So. at 91.

V.
Appellant Williams assigns other errors regarding the sentencing phase of his trial. Because these matters may well recur at the new sentencing trial we here order, we comment upon them briefly.
The appellant also contends that the jury should have been permitted to consider the defendant's diminished capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law... ." Mississippi Code Annotated section 99-19-101(6)(f) (Supp. 1982). There was absolutely no expert testimony which suggested that Williams was mentally retarded or that he was suffering from a mental disorder, disease or defect. Instructions should be given only if they are applicable to the facts developed in the case. Norman v. State, 385 So.2d 1298 (Miss. 1980); Mallette v. State, 349 So.2d 546 (Miss. 1977). The instruction would not have been responsive to the evidence introduced at trial and it was properly refused.

VI.
At the sentencing phase, the trial court excluded expert testimony which would have contrasted Walter Williams' psychological profile with that of other convicted murderers. The offer of proof consisted of testimony from a psychiatrist and a psychologist to the effect that most killers are cold-blooded with no feelings for remorse or guilt. But, in the opinion of those experts, Walter Williams was a different kind of individual because he was *815 not a cold-blooded killer and because he did have feelings of guilt and remorse for his act of killing Ainsworth.
In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court ruled that the sentencer in capital murder cases may not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record which might lessen the punishment. However, the Lockett decision does place certain limits on the kinds of character evidence which may be admitted in mitigation of a capital murder sentence. Nothing in the Court's opinion "limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604, n. 12, 98 S.Ct. at 2965, n. 12.
A capital defendant is certainly entitled at sentencing to offer psychiatric and psychological expert testimony regarding himself.
A fair reading of the Lockett and Eddings opinions fails to substantiate the appellant's contention that those decisions stand for the proposition that a capital murder defendant may introduce evidence concerning the character of other convicted capital murder defendants. Moreover, we believe that an extension of the realm of evidence admissible in such cases to that sought by the appellant would be nothing more than wasteful, time-consuming, irrelevant and immaterial. The testimony in question was properly excluded from consideration by the jury.

VII.
During the sentencing phase, the jury was instructed that it could consider three aggravating circumstances:
(1) Whether the crime was especially heinous, atrocious or cruel;
(2) Whether the crime was committed for pecuniary gain; and
(3) Whether the crime was committed during the commission of a robbery.
The appellant now contends that the instruction constituted reversible error because it failed to direct the jury that it could consider only those three aggravating circumstances. In other words, the appellant contends that the instruction was misleading and could have led the jury to consider other factors.
In our opinion, the issue raised is totally devoid of merit. Foremost in our minds is the simple fact that the jury identified as an aggravating circumstance only the heinous, atrocious or cruel nature of the crime. The jury clearly did not identify any other aggravating circumstances. Moreover, the instruction told the jury which aggravating circumstances they could consider and it did not state that the jury was permitted to consider other factors unnamed in the instruction. The issue simply lacks merit.
GUILT PHASE, Affirmed. All Justices Concur.
SENTENCE PHASE, Reversed and Remanded For New Sentence Phase Trial.
PATTERSON, C.J., and HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
WALKER and BROOM, P.JJ., and ROY NOBLE LEE and BOWLING, JJ., dissent.
NOTES
[1] Williams also argued in this assignment that since our case law requires notice of both the principal charge and the prior convictions in habitual offender cases, see, e.g., Lay v. State, 310 So.2d 908 (Miss. 1975), we should also require notice of the aggravating circumstances in death penalty cases as well. However, the possibility of enhanced punishment in non-death penalty cases is usually not stated in the particular criminal statute for which a defendant is charged with violating. And, there is nothing else which gives notice to the defendant that he may receive an enhanced punishment unless such notice is clearly stated in the indictment. Accordingly, we have recognized that notice of both the principal charge and the previous convictions must be stated in the indictment in habitual offender cases. We do emphasize though that our decision in Williams' assignment of error here should in no way be considered a weakening of our holding in the Lay case.
[2] Instruction No. 2 stated:

The Court instructs the Jury in this case that in determining the issue of the intent to rob the deceased, Venus Ainsworth, the Jury may consider, in addition to any direct evidence which you believe beyond a reasonable doubt, if any, the acts of the person involved, as well as the circumstances surrounding such actions. It is not necessary for that intent to be express, and the surrounding acts are factors the Jury may consider, if they believe them beyond a reasonable doubt. If the Jury finds, beyond a reasonable doubt, that the Defendant in this case robbed the deceased in this case, Venus Ainsworth, of one blue metal money box containing approximately $230.00, good and lawful money of the United States of America or one billfold containing approximately $1,000.00 good and lawful money of the United States of America, or anything of value, in the possession and control of Venus Ainsworth, and did in fact take any of said articles, or anything of value, at the time of the deceased meeting his death, or shortly thereafter, and that any of said articles or anything of value was taken against the will of said Venus Ainsworth and by violence to his person, and from his presence, then, and in that event, the element of robbery has been proven, provided you believe the above, from the evidence in this case, beyond a reasonable doubt.