is reviewable," the prosecutor sought to minimize the sentencing jury's role, by creating the mistaken impression that automatic appellate review of the jury's sentence would provide the authoritative determination of whether death was appropriate. In fact, under Mississippi law the reviewing court applies a "presumption of correctness" to the sentencing jury's verdict. 443 So. 2d 806, 817 (1983) (Lee, J., dissenting). The jury's verdict of death may be overturned only if so arbitrary that it "was against the overwhelming weight of the evidence," or if the evidence of statutory aggravating circumstances is so lacking that a "judge should have entered a judgment of acquittal notwithstanding the verdict." *Williams* v. *State*, 445 So. 2d 798, 811 (Miss. 1984).

Laypersons cannot be expected to appreciate without explanation the limited nature of appellate review, especially in light of the reassuring picture of "automatic" review evoked by the sentencing court and the prosecutor in this case. *Ante*, at 325–326. Although the subsequent remarks of the prosecutor to which JUSTICE REHNQUIST refers in his dissent, *post*, at 345–346, may have helped to restore the jurors' sense of the importance of their role, I agree with the Court that they failed to correct the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate. See *ante*, at 340–341, n. 7. I believe the prosecutor's misleading emphasis on appellate review misinformed the jury concerning the finality of its decision, thereby creating an unacceptable risk that "the death penalty [may have been] meted out arbitrarily or capriciously," *California* v. *Ramos*, *supra*, at 999, or through "whim . . . or mistake," *Eddings* v. *Oklahoma*, 455 U. S. 104, 118 (1982) (concurring opinion).

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

The Court holds that under the Eighth Amendment it is "constitutionally impermissible to rest a death sentence on

a determination made by a sentencer who has been led to believe that the responsibility for the appropriateness of the defendant's death rests elsewhere." *Ante,* at 328–329. Even if I were to agree with this proposition in the abstract, I do not believe that under the circumstances of this case it can properly be applied to justify the overturning of petitioner's death sentence.

Petitioner robbed a grocery and bait shop owned by a Mr. and Mrs. Faulkner. When Mrs. Faulkner screamed, petitioner shot her twice and fled with a bank bag taken from the counter. After a trial the jury found petitioner guilty of capital murder, and the case proceeded to the sentencing phase. At that point the prosecution sought to prove four aggravating factors under Mississippi law, including the facts that the offense was committed while petitioner was engaged in a robbery, and that petitioner had previously been convicted of four felonies involving the use of threats or violence to the person. With respect to the latter factor the prosecution introduced evidence that petitioner had been convicted of felonies four times since 1975—twice for armed robbery, once for attempted armed robbery, and once for aggravated assault. In mitigation petitioner introduced testimony from family and friends emphasizing petitioner's youth and his sound upbringing, and indicating that he was a nice person and a hard worker.

At the guilt phase the jurors had been instructed that they were the "sole judges of the facts," and that it was their duty to find those facts in accordance with the evidence presented, and to apply the rules of law charged by the judge to the facts found. The jurors were also charged that statements made by counsel were not evidence. Prior to closing argument at the sentencing phase the judge further charged the jury that it "must now decide whether the Defendant will be sentenced to death or to life imprisonment." To return the death penalty, the jury was instructed that it must find at least one aggravating circumstance, and that the aggravating circumstances found must outweigh the mitigating circumstances.

Counsel then presented closing arguments. Pursuant to Mississippi law the prosecutor spoke first and last; his initial statement for the most part argued the aggravating factors, and petitioner does not complain of anything said there. Defense counsel then spoke; as the Court indicates, this argument consisted mostly of a plea for mercy, which emphasized the jury's "awesome responsibility." The prosecutor then made the rebuttal argument of which petitioner complains. Because the Court mischaracterizes the prosecutor's statements, it is worth noting again what the prosecutor actually said:

> "I'm in complete disagreement with the approach the defense has taken. . . . I think it's unfair. . . . Now, they would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable."

At this point defense counsel objected, but the trial court allowed the prosecutor to continue after stating: "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the jury so they will not be confused." Counsel continued:

> "[Defense counsel] insinuat[ed] that your decision is the final decision and that they're gonna take Bobby Caldwell out in front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court."

The Court's account stops here, but the prosecutor went on to state:

> "Now, thank God, you have a yardstick to follow. Thank God, you have a set of rules and regulations like they do in a football game. What are the rules and

regulations that you, under your oath, must follow in determining the punishment? Number 1, under your oath, you must decide the facts. That's your job. Not mine, not theirs, not the Judge's, not anybody's—yours. You decide what those facts are. I can't tell you what they are, and you take the rules of law—this right here—the rule book, and you apply them, and you render a fair and impartial trial without passion, without prejudice, without sympathy." (Emphasis supplied.)

The prosecutor then recounted some of the recent history of capital punishment in this country, explaining that this Court originally struck down state capital punishment statutes because of its perception that the death penalty was being imposed arbitrarily. The prosecutor concluded by noting that in response to this Court's concern over arbitrariness

"our Mississippi Legislature . . . adopted the very procedure that you are undergoing now. They said before the death penalty is arbitrarily automatically imposed, *the Jury—the people—the people, not the Court—the people, the heart of the system, must determine—must determine—that the aggravating circumstances, those which tend to say that the death penalty is justified must outweigh the mitigating circumstances, those which say that the lesser should be applied. So, that's how it all evolved, and that's why you're in the Jury Box to determine the punishment,* and that's why, I think it's totally improper to put you in the picture of hang man with a black mask on. That's not fair. You must take the rules, apply the law, and render a fair verdict."

At several points in its opinion the Court supplies its own characterization of the prosecutor's argument. Thus, the Court states that this is a case where "a sentencer . . . has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere,"

*ante,* at 329, and that "[t]he argument here urged the jurors to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death—a determination which would eventually be made by others and for which the jury was not responsible." *Ante,* at 336. See also *ante,* at 333. The Court then builds on this characterization by supplying a further assumption—that a jury that has a lowered sense of responsibility is more likely to vote for the death penalty. The Court hypothesizes that a capital sentencing jury may wish to "send a message" of disapproval even though it is not convinced that death is the appropriate punishment, and that a jury that has been assured that any "error" in imposing the death penalty can be corrected on appeal may feel comfortable with "delegating" its responsibility by voting for death. This "delegation" of responsibility to the appellate courts violates the Eighth Amendment, the Court reasons, because an appellate court is unable to confront and examine the individual circumstances of the defendant firsthand, and is further bound to review the jury's determination with a presumption of correctness. Finally, after distinguishing our decisions in *California* v. *Ramos,* 463 U. S. 992 (1983), and *Donnelly* v. *DeChristoforo,* 416 U. S. 637 (1974), the Court concludes that the sentence here must be overturned because the prosecutor's argument was "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Ante,* at 340 (quoting *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976) (plurality opinion)).

In *Donnelly* v. *DeChristoforo,* this Court rejected a claim that a state murder conviction should be overturned on due process grounds because of statements made by the prosecutor during closing argument. We there stressed that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the

very concept of justice.'" 416 U. S., at 642 (quoting *Lisenba* v. *California*, 314 U. S. 219, 236 (1941)). Similarly, this Court's recent opinions concerning the Eighth Amendment, while recognizing that the "qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination," *California* v. *Ramos, supra*, at 998–999, have also noted that in general the Eighth Amendment is satisfied where the procedures ensure that the sentencer's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant* v. *Stephens*, 462 U. S. 862, 874 (1983); *Barclay* v. *Florida*, 463 U. S. 939, 950 (1983) (plurality opinion). Thus, in both *Zant* and *Barclay* we upheld death sentences despite the fact that they had been based in part on invalid aggravating circumstances, where the jury also had found valid aggravating circumstances.

*Donnelly, Zant,* and *Barclay* teach that a death sentence need not be vacated in every case where the procedures by which it is imposed are in some way flawed. If the prosecutor in this case actually had argued to the jury that it should go ahead and impose the death sentence because it did not really matter—the appellate court would correct any "mistake" the jury might make in choice of sentence—and if the trial judge had not corrected such an argument, I might well agree that the process afforded did not comport with some constitutional norm related to procedural fairness. But despite the Court's sweeping characterization the argument here fell far short of telling the jury that it would not be responsible for imposing the death penalty. Admittedly, some of the remarks early in the prosecutor's rebuttal indicated that the jury's decision was not "final" because it was subject to appellate review. But viewed in its entirety, cf. *Cupp* v. *Naughten*, 414 U. S. 141 (1973), it is evident that the thrust of the prosecutor's argument was that the jury was not *solely* responsible for petitioner's sentence. In ad-

dition to appellate review, the prosecutor referred to the decision of the Mississippi Legislature to allow capital punishment, to the rules that the jury must follow in determining the appropriate sentence, and to the jury's ultimate responsibility under the law to render a "fair verdict," "without passion, without prejudice, without sympathy."

There is nothing wrong with urging a capital sentencing jury to disregard emotion and render a decision based on the law and the facts. Despite the Court's rhetorical references to the need for "reliable" sentencing decisions rendered by jurors that comprehend their "awesome responsibility," I do not understand the Court to believe that emotions in favor of mercy must play a part in the ultimate decision of a capital sentencing jury. Indeed, much of our Eighth Amendment jurisprudence has been concerned with eliminating emotion from sentencing decisions. Here the prosecutor *did not* suggest that the prospect of appellate review should lead the jurors to lean toward the death penalty, and the prosecutor's statements that followed the challenged portion of the argument forcefully emphasized the jury's important role under Mississippi law in determining whether to impose death.

Indeed, under the circumstances here the importance of the jury's role could hardly have been lost on the jurors themselves. The charge at the guilt phase highlighted the jurors' role as factfinders and their duty to follow the law in reaching their conclusions. The importance of their role at sentencing was evident from the charge, from the impassioned plea for mercy from petitioner's counsel, petitioner, and petitioner's mother, as well as from the prosecutor's rebuttal. It is indeed difficult to agree with the Court that a group subjected to all this attention nevertheless interpreted a few remarks by the prosecutor to mean that the group's decision was no more than a sideshow—a mere "preliminary step" toward the ultimate sentencing determination.

Once it is recognized that the Court has overstated the seriousness of the prosecutor's comments the Court's analy-

sis tumbles like a house of cards. Given that it is highly unlikely that the jury's sense of responsibility was diminished, there is no need to respond to the Court's conjecture that the jury would in addition have "delegated" its responsibility by erring in favor of imposing the death penalty. And even assuming that the challenged statements were in some way infirm, I believe this is a case where we should heed the directives of *Donnelly, Zant,* and *Barclay,* and hold that any error did not amount to constitutional error. During the course of a heated trial prosecutors may make many statements that stray from debating society rules as to relevancy, but the ultimate inquiry must be whether the statements rendered the proceedings as a whole fundamentally unfair. I do not believe this analysis is substantially altered because the challenged statements were made during a capital sentencing proceeding. Although the fact that this is a capital case calls for careful review of applicable legal principles, it seems to me that the Court's concern would be essentially the same if at the guilt phase the prosecutor had told the jury to go ahead and convict because any mistakes would be corrected on appeal. Cf. *ante,* at 334, n. 5, and authorities cited therein.

I therefore find unconvincing the Court's scramble to identify an independent Eighth Amendment norm that was violated by the statements here. The Court's string citations to our prior cases, many of which yielded only plurality opinions, which hold that capital sentencing juries must be allowed to consider all forms of mitigating evidence so as to facilitate individualized and rational determinations of the appropriateness of capital punishment, simply highlight the lack of authority for the path that the Court now takes. Nor do I find particularly illuminating the citation to dicta that the Eighth Amendment requires procedures that will ensure a "reliable" determination that death is an appropriate punishment. Although the Eighth Amendment requires certain processes designed to prevent the arbitrary imposition of

capital punishment, it does not follow that every proceeding that strays from the optimum is *ipso facto* constitutionally unreliable. *Zant* and *Barclay* hold as much.

Nor does the Eighth Amendment prohibit any and all communication to a capital sentencing jury concerning the availability of appellate review. In *California* v. *Ramos*, we upheld against Eighth Amendment challenge a California statute that required capital sentencing juries to be informed that the sentence of life without possibility of parole was subject to commutation by the Governor. We noted, *inter alia*, that the instruction was "merely an accurate statement of a potential sentencing alternative," 463 U. S., at 1009, and held that informing the jury of the possibility of commutation did not inject too speculative a concern into the jury's deliberations. Although we noted in *Ramos* that the challenged information bore more than marginal relevance to the jury's sentencing determination, *Ramos* is not distinguishable from this case on that ground; there is no constitutional requirement that all information received by a sentencing jury be "relevant." In any event, the fact that the jury's determination is subject to appellate review, if not common knowledge, is in any event information concerning the judicial process that one would think the jury is entitled to know. Nor do I think this case distinguishable from *Ramos* because here the prosecutor's statements "misrepresented" the appellate process. There are circumstances where misrepresentations by prosecutors will violate due process, see *Miller* v. *Pate*, 386 U. S. 1 (1967); *Brady* v. *Maryland*, 373 U. S. 83 (1963), but here the reference to appellate review certainly did not include an express statement that such review was *de novo*, and any implication along those lines was cured by the later statements emphasizing the jury's responsibility under the Mississippi sentencing scheme.

This Court should avoid turning every perceived departure from what it conceives to be optimum procedure in a capital case into a ground for constitutional reversal. In this case

the State of Mississippi proved four aggravating factors, including that petitioner previously had been convicted of four crimes involving threat of violence to a person. The jury was instructed to find the facts based upon the evidence and to apply those facts to the law as charged; at the sentencing proceeding it was told that it must find that the aggravating factors outweighed the mitigating factors, and the prosecutor's argument stressed these aspects of the jury's singular duty. There is no indication in the record that the jury returned the death sentence on any basis other than the evidence adduced, nor is there any reason to question the. jury's conclusion. Under those circumstances I do not think that the Eighth Amendment or any other provision of the Constitution requires that petitioner's death sentence be overturned.* I would affirm the judgment of the Mississippi Supreme Court.

---

*The Court notes that other state courts have condemned the type of argument challenged here, *ante,* at 334, and that the Mississippi Supreme Court, since its decision in this case, has also found such an argument to be reversible error. See *Williams* v. *State,* 445 So. 2d 798 (1984). But these facts suggest that draconic intervention by this Court in the name of the Eighth Amendment generally is not required to correct aspects of state procedure that appear less than ideal to all of us. Doctrinal development in the tradition of the common law, where state-court decisions commend themselves not by their authority but by their reason, ultimately bids fair to remedy such minor departures from procedural norms as may be involved in this case.