544 So.2d 782 (1987)
Jessie Derrell WILLIAMS
v.
STATE of Mississippi.
No. DP-56.
Supreme Court of Mississippi.
October 7, 1987.
As Modified On Rehearing June 21, 1989.
*783 Thomas M. Fortner, Pascagoula, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court on Parts I-V; ROY NOBLE LEE, Presiding Justice, for the Court on Part VI.
When, on the evening of January 11, 1983, Karon Ann Pierce entered the Scoreboard Lounge in Jackson County, Mississippi, she set in motion the series of events that would lead to her death and the conviction of Jessie Derrell Williams for the crime of capital murder, and his sentence, by a jury in Lauderdale County, Mississippi, of death.
*784 The facts of this case are so bizarre and the methods used to bring about the death of Miss Pierce are so relentlessly savage that no purpose will be served by repeating them here, except where they are essential to the ends of justice in dealing with the issues raised by the appeal.

I.

DID THE PROSECUTOR IMPROPERLY EXTRACT FROM EACH PROSPECTIVE JUROR A PLEDGE OR PROMISE AS TO THE VERDICT EACH WOULD RENDER DURING VOIR DIRE?
The prosecutor asked at least eighteen individual jurors whether or not they would or will vote guilty if the state proved its case against Jessie Derrell Williams, and whether or not the jurors would or will vote for death if the state proved that the aggravating circumstances outweighed the mitigating circumstances. Williams urges that such questions were in direct violation of our Uniform Criminal Rules of Circuit Court, Rule 5.02, the text of which reads:
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked. (emphasis added)
After repeated objections, the first of which was overruled, the trial judge then instructed the prosecutor to offer a complete and accurate statement of the law if he insisted on posing that question. Despite this admonition, the prosecutor continued with the same form of question at which time the trial judge directed the district attorney to use the verb "could" as opposed to the verb "would". Again the district attorney continued with the same form of the question. Another objection was entered by Williams which was overruled, and the district attorney continued with the "would" form of the question through six more jurors.
We have repeatedly admonished district attorneys that their examination during voir dire should be abstract as opposed to what the juror might or might not do in the particular case at bar. Murphy v. State, 246 So.2d 920, 921 (Miss. 1971); McCaskill v. State, 227 So.2d 847, 852 (Miss. 1969) (reversed on other grounds); Phenizee v. State, 180 Miss. 746, 178 So. 579, 582 (1938). In Phenizee, Justice Griffith explained:
The examination on the question we are here considering should be in the abstract as to the class of cases, one of which is about to be tried; not what the juror or jury might or might not do in a particular case then and there at bar. It is time enough for the district attorney, in the particular case, to call for the death penalty in his argument on the merits after the jury has heard all of the evidence, and can better judge of the weight of that argument and of the justification of the demand for the death penalty, rather than it shall be emphasized upon the voir dire.
178 So. at 582.
Judge Griffith went on to note however:
We have concluded that, in the light of the matters last mentioned, a jury of fair intelligence, as we must presume this jury was, could not have understood otherwise than that the penalty, whether of death or of life imprisonment, was solely for them to determine, and that no official of the state had a right to dictate to them about it or to do more than submit to the judgment of the jury on that question.... Thus, in this case we think we may safely rest on the conclusion that this jury was neither misled nor wrongfully or unduly influenced by what happened on the voir dire, particularly in view of the evidence on the merits which so strongly justified the extreme penalty.
178 So. at 582.
The trial court's discretion in passing upon the extent and propriety of questions addressed to prospective jurors is not unlimited and this Court will take note of abuse on appeal where prejudice to the *785 accused is present. Jones v. State, 381 So.2d 983, 990 (Miss. 1980); McCaskill v. State, 227 So.2d 847, 852 (Miss. 1969); Leverett v. State, 112 Miss. 394, 404, 73 So. 273 (1916). A comparison of the abuses found in Leverett which led to reversal with the statements made by the district attorney in the case at bar makes it clear that the case at bar falls under the Phenizee no reversible error present line, as opposed to the obvious abuse present in Leverett.
The court properly condemned the conduct of the district attorney in seeking to force a committal from the jury, but when we consider that conduct, in context with the jury instructions given to the jury by the trial judge, it is clear that the jury was aware of their proper role in determining guilt and sentence, and, that being true in this case, there is no merit to this assignment of error.

II.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE GRAPHIC PHOTOGRAPHS?
Williams objected to the introduction of certain photographs contending that they were unnecessarily enlarged, were gruesome, repetitive and thus prejudicial and inflammatory. The subject matter of those photographs was:
Exhibit 3(A), the heart and larynx of the victim, separated from the body at autopsy;
Exhibit 3(B) and (C), upper portions of the victim's body at autopsy;
Exhibit 4(A), Pierce's body as found at the scene of the murder;
Exhibits 4(B), (C), (D), (E), close up views of the chest area at autopsy;
Exhibits 5(A), (B), (C), (D), enlarged close up views of the wound to the genital area.
While acknowledging that generally the admissibility of photographs is within the sound discretion of the trial judge and the admission is proper, so long as their introduction serves some useful evidentiary purpose. Williams contends that the close-up photographs were not necessary for the jury's understanding of the cause of death nor was the repetitive nature, and the result could only be to inflame and prejudice the jury.
We have repeatedly admitted photographs of every description with the explanation that some "probative value" is present. Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985); Swanier v. State, 437 So.2d 180, 185 (Miss. 1985); Cabello v. State, 471 So.2d 332, 341 (Miss. 1985); Holliday v. State, 455 So.2d 750, 752 (Miss. 1984); Billiot v. State, 454 So.2d 445, 460 (Miss. 1984). Abuse of discretion is sometimes explained to be admission of photographs when a killing is not contradicted or denied or the corpus delicti and the identity of the deceased have been established. Sharp v. State, 446 So.2d 1008, 1009 (Miss. 1984); Shearer v. State, 423 So.2d 824, 827 (Miss. 1982); Williams v. State, 354 So.2d 266, 267 (Miss. 1978).
A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. At this point in the development of our case law, no meaningful limits exist in these so-called balance of probative/prejudicial effect of photographs test.
This assignment of error is no basis for reversal.

III.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN THE ADMISSION OF CERTAIN TESTIMONY OF THE STATE'S EXPERT WITNESS, DR. PABLO HERNANDEZ?
The underlying felony the prosecutor sought to prove in this case was kidnapping. He, therefore, relied heavily on the expert medical opinions of Dr. Hernandez to prove that Miss Pierce's inability to consent in her drugged state supported a finding that she had been kidnapped. The subject matter of that testimony included:
*786 (1) The effects of PCP and methaqualone on a person;
(2) The potentiation effect of PCP and methaqualone on a person;
(3) The effect of PCP, methaqualone, alcohol, and marijuana on Karon Pierce;
(4) The ability of Pierce to make rational judgments while under the influence of the above listed substances.
Dr. Hernandez also answered a hypothetical question posed by the prosecutor which Williams maintains contained far too many uncertainties and unknowns to have properly been placed before the jury.
Dr. Hernandez explained that "potentiation" is medical terminology meaning the use of two medications or chemicals in combination, which increased the effect of one or both. When he was questioned about the process of potentiation with use of alcohol and methaqualone, Williams objected on the grounds that there was no evidence of Miss Pierce taking methaqualone on the night of her death or within any reasonable time period prior to her death as the toxicologist had refused to offer any opinion as to the time or amount of any ingestion of that drug by Miss Pierce. Only a trace amount of methaqualone was found in her system, which could have been ingested at any time prior to the incident. This objection was overruled.
Dr. Hernandez was asked the following hypothetical:
I would like to pose a hypothetical, and based on these facts I want to know if you can draw a conclusion. The subject is an 18 year old girl, 5' 4" tall, weighing 118 pounds. She was staggering and her speech was slurred. She was coherent one minute and incoherent the next. She was hollering and telling people to leave her alone. Inside her body was discovered traces of PCP, methaqualone, and alcohol. Based on this hypothetical, do you have an opinion, to a reasonable medical certainty, as to the amount of her intoxication or the level of these drugs in her system?
When Williams objected that this hypothetical did not adequately and fully state the facts, the trial judge overruled the objection and allowed the doctor to answer, explaining that the defense could add other facts on cross examination. The doctor's answers to the hypothetical and the follow-up questions were as follows:
BY THE WITNESS: The physiological response and psychological response of a person to these drugs  PCP, quaalude, alcohol  would depend on and vary greatly upon the amount of the drug ingested, the method of ingestion, and the way and the length in which one unto the other had interacted. Talking about PCP specifically, it has to do with the events that are taking place throughout the process. PCP has a more disturbing effect on people by virtue of situations, events, and circumstances that are going on. A person on PCP will act more agitated, more restless. The "hollering" and running up and down you describe in the hypothetical, this could be an effect upon a person who has a mixture of those drugs.
... .
By MR. GURROLA: Would you have an opinion as to how intoxicated that person would be on those drugs?
BY MR. GAUTIER: Continuing to show our objection.
BY THE WITNESS: In that particular correlation, the person would be in a level of high influence of intoxication upon the combination of the drugs. We don't know the amount of drugs in that person or the amount of drugs that person had taken. There is an indication, hypothetically, that she was in a level of intoxication. I would say this person was in a level of intoxication from which, more likely, probably, impaired judgment may take place, no awareness of components of situations taking place. The person may not be totally in control of the total judgment in that situation. They may not be able to utilize proper judgment according to the situation.
BY MR. GURROLA: In your opinion, would that person, in that state, have been able to make rational judgments based on the situations?

*787 BY MR. GAUTIER: We would show a continuing objection for the reason that the hypothetical has too many uncertainties, ifs, and unknowns in it.
BY THE COURT: Overruled.
BY THE WITNESS: Hypothetically, with that level of disfunction in the picture that I have been given, that person would not have been able to make the proper judgment in the situations and conditions for which a response in that part would be made of that person.
BY MR. GURROLA: Taking the same hypothetical which I have already given you, add to it the fact that this same individual some several hours later is smoking two to six marijuana cigarettes, would you be able to form an opinion as to that person's ability to make rational judgments based on the situation?
BY MR. GAUTIER: We object again for lack of completeness of the hypothetical and for the reason that the witness has not been qualified as an expert on what is rational and what a rational judgment is.
BY THE COURT: If he can answer, I will allow him to answer. Objection overruled.
BY THE WITNESS: Would you repeat the question?
[The question was repeated]
BY THE WITNESS: If this person was exhibiting that type of behavior or activity or disruption three to four hours prior to smoking several joints of marijuana, that person still more likely will be in the influence of the previous drug and will not be able to make a good, sound judgment with the added effect of the marijuana. In other words, all of this and the smoking of the marijuana would make me think that this person would be in a deeper state of disfunction than at a more functionable level. They will be much more improbable to make proper judgment because the effect of some of these drugs does not vanish within an hour or two or three.
While on cross-examination, Dr. Hernandez acknowledged that several factors would affect his answer, including the person's experience with drugs, the tolerance level of the person, previous usage, nutritional level, tissue condition and fat distribution, age, racial component, as well as the frame of mind of a person at a given time, influence on the person, situation the person is experiencing, and the desired effect that the person wants. The doctor finally stated that he would really have to see the person before rendering an opinion.
This Court has held that "the interrogator may frame his question on any theory which can reasonably be deduced from the evidence and select as a predicate therefor such facts as the evidence proves or reasonably tends to establish or justify." Carleton v. State, 425 So.2d 1036, 1040 (Miss. 1983); Chapman v. Carlson, 240 So.2d 263, 268 (Miss. 1970). Whether or not sufficient evidence is present to support the hypothetical question presented to the expert is a question of law for this Court to determine. Strickland v. M.H. McMath Gin Co., Inc., 457 So.2d 925, 928 (Miss. 1984); Belesky v. City of Biloxi, 412 So.2d 230, 233 (Miss. 1982). When facts are in dispute the hypothetical question may be stated in terms consistent with the theory of the interrogator. 457 So.2d at 928; Magnolia Hospital v. Moore, 320 So.2d 793, 798 (Miss. 1975). The interrogator cannot, however, assume facts unsupported by any evidence, 457 So.2d at 928; Washington v. Greenville Mfg. & Machine Works, 223 So.2d 642, 644 (Miss. 1969), nor omit material undisputed facts. 457 So.2d at 928; 320 So.2d at 799. Slight exaggerations of the evidence presented in the hypothetical generally will not require its exclusion. 457 So.2d at 929. If the question posed fairly summarizes the relevant facts, it is not necessary that every minute undisputed detail be included, so long as opposing counsel has an opportunity on cross-examination to bring out the additional details. Gerlach v. State, 466 So.2d 75, 78 (Miss. 1985).
The trial court was authorized by our law to overrule the objections to the hypothetical question. 466 So.2d at 78; King v. State, 251 Miss. 161, 174, 168 So.2d 637, 642 (1964). This record shows that on *788 cross-examination Dr. Hernandez freely admitted just exactly how contingent his opinion was upon various factors.
The conclusions of Dr. Hernandez were no more than a layman could determine for himself if presented with the same question. The doctor testified that a person on PCP, Quaaludes, and alcohol would be in a level of intoxication and that smoking two to six marijuana cigarettes would increase that level of disfunction.
There is no error here.

IV.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN REFUSING JURY INSTRUCTION D-5?
Sentencing phase instruction D-5 reads:
The Court instructs the jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment. A life sentence may be returned regardless of the evidence.
Williams contends that reversible error resulted from the trial judge's refusal of the so-called "mercy" instruction.
The theoretical justifications for the mercy instruction have been articulated in Leatherwood v. State, 435 So.2d 645, 660-63 (Miss. 1983), and in many cases by Justice Hawkins. See e.g. Cabello v. State, 471 So.2d 332, 352 (Miss. 1985). Here we are offered the additional argument that, as the prosecutor was allowed to elicit promises from the jurors during voir dire that they would return a death sentence if they believed that the aggravating circumstances outweighed the mitigating circumstances, instruction D-5 was necessary to correct this earlier error. Williams argues that Mississippi Code Annotated § 99-19-101 allows a jury to sentence to death under certain circumstances as opposed to requiring such a sentence. The argument is not that a mercy instruction should be given in all cases but that in this case, because of the problems created in voir dire, the mercy instruction is necessary. The Attorney General's response is flatly that there is no right to such an instruction. Our case law supports the Attorney General in this regard. Cabello v. State, 471 So.2d 332, 348 (Miss. 1985); Billiot v. State, 454 So.2d 445, 466 (Miss. 1984); Hill v. State, 432 So.2d 427, 441 (Miss. 1983); Jordan v. State, 365 So.2d 1198, 1205 (Miss. 1978).
It does not follow from the state's extracting promises from the jurors during voir dire that a life option instruction such as the one offered here must be granted. The fact that the jury was properly instructed as to their option of either the death penalty or life imprisonment cures any mistakes made during voir dire. Bingham v. State, 434 So.2d 220, 225 (Miss. 1983); Matthews v. State, 394 So.2d 304, 307 (Miss. 1981).
There is no merit to this assignment.

V.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN OVERRULING THE MOTION FOR A DIRECTED VERDICT ON THE CHARGE OF CAPITAL MURDER AND FOR SUBMISSION OF THE CASE TO THE JURY ON THE LESSER INCLUDED OFFENSE OF MURDER AND WAS THE VERDICT OF THE JURY FINDING WILLIAMS GUILTY OF CAPITAL MURDER AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
The thrust of this entire assignment of error is that the state failed to prove the underlying felony of kidnapping. In ruling on the motion for a directed verdict, the trial court said:
All right. Let me say that I have heard the testimony here. It is the opinion of the court that there is sufficient evidence to present the question of kidnapping to the jury. Of course, it started with the testimony of Terrell Evans who indicated that, while in the Scoreboard Lounge, he and the defendant observed the victim in this case, who was obviously intoxicated, under the influence of drugs or diminished capacity of some kind, and they hatched a plan that they were going to wait until the other *789 people had their fun, and then they would take her off, and I think it started at that point. And the other matters alluded to by the district attorney, of course, I believe all furnished sufficient evidence for the jury issue. The motion will be overruled.
Kidnapping is defined by Mississippi Code Annotated § 97-3-53 (Supp. 1985) as follows:
§ 97-3-53 Kidnapping; capital punishment authorized.
Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will, or shall without lawful authority forcibly seize, inveigle or kidnap any child under the age of ten (10) years and secretly confine such child against the will of the parents or guardian or person having the lawful custody of such child, shall, upon conviction, be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the state penitentiary.
In Hughes v. State, 401 So.2d 1100 (Miss. 1981), this Court explained:
In order to clearly set forth the different elements which may constitute kidnapping under the statute, we restate the statute as follows:
Every person who shall, without lawful authority
(1) forcibly seize and confine any other,
(2) or shall inveigle or kidnap any other
(3) with intent
(a) to cause such person to be secretly confined or imprisoned in the state against his will,
(b) or to cause such other person to be sent out of this state against his will,
(c) or to cause such other person
(1) to be deprived of his liberty,
(2) or in any way held to service against his will ...
Under the statute the state must prove that a person, without lawful authority, either (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such person to either (a), (b), or (c) above.
401 So.2d at 1105, Cited with approval in Brewer v. State, 459 So.2d 293, 296 (Miss. 1984).
In order for this conviction to stand, the prosecutor is required to prove every element of the kidnapping offense beyond a reasonable doubt. Patterson v. York, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281, 292 (1977); Jackson v. Virginia, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576-77 (1979); Neal v. State, 451 So.2d 743, 757 (Miss. 1984).
In Neal, we held that circumstantial evidence such as the victim's dress, location of the body, and bruised condition of the body were sufficient to show involuntary accompaniment and service against one's will. 451 So.2d at 758. The victim in Neal was thirteen, as opposed to eighteen, the age of the victim in this case. See also Fisher v. State, 481 So.2d 203, 212-14 (Miss. 1985).
The record contains certain circumstantial evidence which supports the verdict finding a kidnapping:
Dr. Paul McGarry testified to the abused condition of the body;
Photographs of the wounds were admitted into evidence;
Jenny Cummings testified Miss Pierce appeared to be on drugs, and she saw Terrell Evans place Karon Pierce in the truck;
Terrell Evans testified that he and Williams had agreed to take Karon off and have sex with her;
Terrell Evans testified that Karon wanted to go back to the Scoreboard to get her purse and sandals but they didn't take her;
The toxicologist testified that Karon's blood alcohol sample was .07 and that *790 stomach contents, bile, and blood tests revealed traces of PCP and quaaludes.
We note further that the jury also had access to the following:
Karon refused to leave the Scoreboard when her date was forced to leave, saying that someone else would take her home;
Karon's mother's statement that Karon "had pulled these stunts before;"
Once Karon had been put in the truck by Evans she let herself out and voluntarily went back into the Scoreboard Lounge of her own free will;
Karon voluntarily engaged in foreplay, she voluntarily smoked marijuana and drank beer with Evans, Norwood and Williams, she voluntarily had sex with Norwood and Williams;
After protesting sex with Williams for the second time she again smoked marijuana, drank, laughed and joked with all three men;
Karon was able to get out of the truck and go to the bathroom three times under her own power and voluntarily returned to the truck each time;
The testimony further suggested that she was beaten and possibly sexually abused at the Scoreboard Lounge before she left with the three men.
Under the prosecutor's theory of the case, several kidnappings took place: the first, when Karon was taken from the Scoreboard Lounge in the truck; the second, when she requested to get her shoes and was not returned to the Scoreboard Lounge; the third because of her intoxicated condition; and the fourth when she was dragged or carried into the woods from the truck.
Unlike the victim in Haymond v. State, 478 So.2d 297 (Miss. 1985), Karon Pierce was never comandeered against her will in the truck. She apparently was a willing participant until the fourth attempted sex act, at which point she began her protest.
When we view the evidence in the light most favorable to the prosecutor, it is conceivable that a reasonable juror could have found that Karon Pierce was inveigled, i.e., enticed or tricked, with intent to secretly confine her against her will. As kidnapping is not a specific intent crime, it is sufficient that the circumstances resulted in such a manner as to effect a kidnapping as opposed to an actual intent to kidnap, i.e., it is not necessary to establish the mental state of intent by direct evidence. Williams v. State, 445 So.2d 798, 809 (Miss. 1984); Voyles v. State, 362 So.2d 1236, 1243 (Miss. 1978). The fact that the confinement is minor is of no consequence so long as it is present:
If forcible detention or movement is merely incidental to a lesser crime than kidnapping, such confinement or movement is insufficient to be molded into the greater crime of kidnapping. An illustration might well be a strong-armed robbery where the victim is detained and perhaps moved a few feet while being relieved of his wallet. The detention and movement would not support kidnapping albeit with force and unlawful. On the other hand, if the confinement or asportation be not merely incidental to a lesser crime, but a constitutent part of the greater crime, the fact of confinement or asportation is sufficient to support kidnapping without regard to distance moved or time of confinement.
Cuevas v. State, 338 So.2d 1236, 1238 (Miss. 1976).
There is no merit to this assignment of error.

VI.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN FAILING TO GRANT DISCOVERY OF ALL EVIDENCE PERTAINING TO CRIMES COMMITTED AGAINST KARON ANN PIERCE BY PERSONS OTHER THAN JESSIE DERRELL WILLIAMS ON THE NIGHT OF HER DEATH; IN FAILING TO GRANT DISCOVERY OF ALL STATEMENTS OF PERSONS CHARGED WITH COMMITTING CRIMES AGAINST PIERCE ON THE NIGHT OF HER DEATH; AND IN FAILING TO GRANT DISCOVERY OF ALL EVIDENCE WHICH LED TO *791 THE ARREST OF JOHN PAUL ADAMS AND MITCHELL BYRD FOR THE CAPITAL MURDER OF PIERCE; IN FAILING TO PROVIDE A LIST OF ALL PERSONS WHOSE STATEMENTS WERE PROVIDED TO THE COURT FOR IN-CAMERA INSPECTION?
We discuss only that part of Assigned Error VI which involves approximately sixteen (16) statements provided to the court by the State for in-camera inspection, since, in our opinion, there is no merit in the other requests stated in Assignment VI.
Appellant contends that under the holding in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied due process when the prosecution declined to make available to him statements which were delivered by the prosecution to the trial judge for inspection and determination as to whether or not they were exculpatory. The United States Supreme Court held in Brady v. Maryland, supra, that suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material, either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution. In Brady, the defendant requested that he be permitted to examine the extra-judicial statements made by the defendant's confederate, wherein the confederate admitted he had done the actual killing, and the court ruled that denial of such request denied due process as guaranteed by the Fourteenth Amendment.
In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the court held that the U.S. Government's failure to assist the defense by disclosing information that might have been helpful in conducting cross-examination amounts to a constitutional violation only if it deprives the defendant of a fair trial; that constitutional error occurs, and a conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial; and that evidence withheld by the government is material, as would require reversal of conviction, only if there is reasonable probability, that, had evidence been disclosed to the defense, the result of the proceeding would have been different.
Mississippi Uniform Criminal Rule 4.06(a)(6) requires disclosure to the defense of a "copy of any exculpatory material concerning the defendant." The trial judge carefully examined the statements provided to him in camera review prior to the trial, and held that they were not exculpatory and thus not discoverable under the rules and law. The question before this Court now, in light of the rules and decisions, is whether the trial judge erred in holding that the material delivered to him and examined by him prior to trial was not exculpatory and not discoverable.
Without question, it is settled that exculpatory evidence in possession of the State must be turned over to the defense prior to a criminal trial, if material, and if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. We are faced with a different situation from that in Hentz v. State, 489 So.2d 1386 (Miss. 1986), where the prosecuting attorney stated in response to the request for certain tape recordings that, in his judgment, there was no exculpatory material in the tapes, thus, the reason that disclosure was declined. There, the trial judge did not examine, hear and inspect the evidence, i.e., tapes, while here, the trial judge read the statements, examined them, and made a finding of fact that they were not exculpatory. In Hentz, the defendant could only rely upon the statement made by the prosecuting attorney, which was far from sufficient. In-camera review of the statements and material, as was done here by the trial judge, was sufficient compliance with the rules and with state and federal law. The judgment of the trial judge is subject to the review of this Court only for correctness under the facts and the law.
Now, having stated the narrow question that is before us on this issue, we turn to a review of the trial judge's conclusion that the material in issue was not exculpatory, *792 thus not discoverable. The documents in question are numerous papers, consisting of reports and statements. We have carefully examined these documents and find nothing in them which suggests that they could have been successfully utilized by the defense to create a reasonable doubt as to Williams' guilt. In our opinion, there is no probability, much less the reasonable probability as required by law, that this material would have substantially altered the outcome of the trial. Accordingly, we hold that the trial judge acted within his discretion in finding that the material was not discoverable under state and federal law, and that the appellant's argument to the contrary is without merit.
Finding no reversible error in the trial below, the judgment imposing the death penalty upon appellant is affirmed and the date of his execution is set for Tuesday, November 17, 1987.
CONVICTION FOR CAPITAL MURDER AFFIRMED AND TUESDAY, NOVEMBER 17, 1987, SET FOR EXECUTION OF THE DEATH PENALTY IN THE MANNER PROVIDED BY LAW.
As to Parts I-V: All Justices concur.
As to Part VI: WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, GRIFFIN and ANDERSON, JJ., concur.
As to Part VI: SULLIVAN, PRATHER and ROBERTSON, JJ., dissent.
SULLIVAN, Justice, dissenting as to Part VI:
There can be no doubt that the crime we confront today is one of the most heinous and barbaric in the annals of our jurisprudence. This fact, however shocking it may be, does not shade our review nor may we allow it to blind us to the blatant discovery violation reflected in this case. If we are a nation of laws then our system of criminal justice must be weighed in the balance of how that system deals with the savages and the monsters that walk among us and not how it deals with our best and our brightest. With all deference, I dissent to that portion of the majority opinion which holds proper the restraint of the defense from access to sixteen material witness statements aggregating over three pounds in weight.
Our history on the issue of discoverability of allegedly exculpatory witness statements has been admittedly checkered, due in great part to the inherent confusion in application of one of the portions of our discovery rule. See Barnes v. State, 471 So.2d 1218, 1222 (Miss. 1985), (Anderson, J., specially concurring). The literal language of the rule requires absolute disclosure by the state of "any exculpatory material concerning the defendant." Unif.Crim.Rule 4.06(a)(6). Witness statements, however, are covered by a separate rule subsection which requires the state, upon defense request, to furnish to the court in camera "any prior written statements of witnesses." Rule 4.06(h). I submit that the majority has blurred these two rule subsections and decided the discovery issue under the wrong law. Regardless of whether allegedly exculpatory material occurs in the form of tapes, reports, or the weighty witness statements present in this case, the focus of our review is governed first by a simple two-fold analysis: (1) Is the material exculpatory, and if so, (2) to whom must it be delivered?
This Court has made headway in the recent past in unraveling the perplexing misinterpretation engaged in by the prosecutors of this State concerning the discovery of exculpatory material. Hentz v. State, 489 So.2d 1386 (Miss. 1986), charts a clear course in this area and I suggest that it controls the present case and dictates reversal. As we said in Hentz,
An important question in discovery, such as involved here, is who is going to determine whether or not tapes or written instruments are exculpatory or important to the defense, if counsel is unable to see, hear, or know what is contained therein? Is the State attorney the only person who will make that determination? We think not. The Court now declares that as a matter of good practice *793 and sound judgment in the trial of criminal cases, prosecuting attorneys should make available to attorneys for defendants all such material in their files and let the defense attorneys determine whether or not the material is useful in the defense of the case. We direct the attention of trial judges to this problem and suggest that they diligently implement this suggestion in order to dispense with costly errors, which might cause reversal of the case. Barnes v. State, 460 So.2d 126 (Miss. 1984); Harris v. State, 446 So.2d 585 (Miss. 1984); Morris v. State, 436 So.2d 1381 (Miss. 1983).
489 So.2d at 1388.
I respectfully disagree with the majority's characterization of Hentz as requiring disclosure of only evidence which would be, in all probability, outcome determinative. At 791. The unambiguous and literal import of Hentz requires the district attorney to turn over his file to the defense so that defense counsel may determine where it contains material which "is useful in the defense of the case." Id.
The material denied to the defense in this case consists, in part, of sixteen written statements of witnesses, all taken during the investigatory stage. The statements are replete with evidence that many of the declarants (who ultimately testified for the state) gave inconsistent versions of relevant events. The statements further contain a fertile filed of information which could easily have been utilized by defense counsel to assail the witness' credibility. Most seriously, the statements evidence matters which, in the hands of zealous defense counsel, could have been developed to diminish the level of culpability attributable to Williams. It goes without saying that all of this matter would have been "helpful to the defense" of one on trial for his life. It is not to be doubted that on the transcript of the record before this Court the evidence of Williams' guilt of the monstrous crime is manifest. However, we cannot on that record conclude that because "the evidence of guilt is so great" Williams must die in spite of the discovery violation. Had the prosecution simply obeyed the law and played fairly with the attorney for Williams this record may have been entirely different; so different in fact that the evidence of guilt might well have not been so overwhelming. Our ruling today allows the prosecutor absolute control over what information will be allowed to appear in the record to evidence the guilt or innocence of the accused. No one should face a trial for his life under such circumstances. I am firmly committed to the belief that a Mississippi jury will do justice in a case when all the facts are placed before it and I do not and never will share the fear of the prosecution in this case that a Mississippi jury is not to be trusted with a complete disclosure. If the administration of the criminal law in the State of Mississippi is so weak, fragile and untrustworthy that we cannot place all the facts in the hands of our juries and trust them to do justice, then perhaps the time has come to abandon that system. I do not and cannot believe that we have come to such a sorry pass. I am confident that Jessie Derrell Williams and every other accused person in this State should be allowed to go before a Mississippi jury fully armed with facts necessary to offer his defense and that the jury will do justice. There has never been a time and there has never been a case that would justify the prosecution's attempt to conceal evidence to avoid a just result.
In summary, I regret and cannot join the majority's weakening of one of the very few bright-line rules we have carved in the area of discovery, and have repeatedly followed in Williamson v. State, 512 So.2d 868 (Miss. 1987); White v. State, 498 So.2d 368 (Miss. 1986); Cooley v. State, 495 So.2d 1362 (Miss. 1986); Foster v. State, 493 So.2d 1304 (Miss. 1986); and Stringer v. State, 491 So.2d 837 (Miss. 1986).
PRATHER and ROBERTSON, JJ., join this dissent.

ON PETITION FOR REHEARING
On the Petition for Rehearing, the appellant, Jessie Derrell Williams, argues (1) that this Court committed significant errors of law and fact in its resolution of *794 Part VI of the original opinion; and (2) that the court failed to address appellant's Assignment of Error VII which asserted reversible error due to the State's closing argument on the sentencing phase of his trial.
The court hereby denies appellant's Petition for Rehearing as to Assignment of Error VI, however, finding that appellant's Assignment of Error VII was inadvertently omitted from the original opinion, the court does grant appellant's Petition for Rehearing for the purpose of disposing of this assignment of error only.

VII.

DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN OVERRULING WILLIAMS' MOTION FOR A MISTRIAL MADE FOLLOWING COMMENTS BY THE DISTRICT ATTORNEY DURING CLOSING ARGUMENT?
This issue arises out of the closing arguments made during the sentencing phase of the trial and Williams now contends that the district attorney improperly commented on the possibility of parole and appellate review of death sentences.
The comments by both defense counsel and the district attorney have been included in toto. Defense counsel's comments are included because on appeal the prosecution claims that the comments by the State were invited by defense counsel.
BY MR. GAUTIER: You will be reminded of these little doubts that you have. They will grow. You will be reminded of the situation. You will see things in the newspapers. Time will pass. A couple of years, maybe three; it won't be much ... it won't be any longer than that, maybe less ... maybe less than three. You will read in the paper about the District Attorney saying, "Don't worry, Governor." Some new attorney for Jessie Williams will have gone to the Governor and asked for a pardon, clemency and you will hear about the District Attorney saying, "Don't worry, Governor. It's not in your hands. The jury made the choice. They chose. Don't worry about it. They made the choice." That's what we read last summer. That's what we read last summer when there was an execution here. And the same District Attorney who will stand up here and tell you that you have no responsibility for this told the Governor, "Don't worry about it. The jury made the choice." Last summer was a different case ... a lot worse case, a much worse case.
BY MR. MOORE: Now, Judge 
BY MR. GAUTIER: But the District Attorney's attitude about the death penalty is 
BY MR. MOORE: Excuse me, Mr. Gautier.
BY MR. GAUTIER: Are you making an objection?
BY MR. MOORE: Yes.
BY MR. GAUTIER: Go ahead.
BY MR. MOORE: Judge, I want to make sure that the record is complete that since he has brought the case of Jimmy Lee Gray before the jury, that if I have to on my closing argument, I can go in and compare the facts of the two cases.
BY MR. GAUTIER: I didn't mention any names, Judge.
BY THE COURT: Continue your argument.
BY MR. GAUTIER: (Continuing Closing Argument) Last summer's case, the case of Jimmy Lee Gray, involved a three or four year old child who was raped and sodomized, and I think orally raped also; I'm not sure. A little kid (inaudible), a small child 
BY THE COURT: Speak up loudly and clearly.
BY MR. GAUTIER: A small child ... a three or four year old child, by a man who had already previously been convicted of murder. It was a worse case. But as I'm saying, the District Attorney's position on who is responsible hasn't changed and won't change. So don't let him stand up here and tell you that you don't have to do some serious thinking and carry some responsibility. Jessie may be a scum, but he can't die unless *795 you decide he has got to. He can't be executed.
* * * * * *
BY MR. MOORE: ... I find myself somewhat restrained by the law to mention certain things, but what we call opening the door has just happened.
The thing that scares me about these type cases more than anything else, the one thing that really brings horror to me, it brings horror to each and every one of you and the citizens that you represent here today, it scares me to think what happens when a man is allowed to continue a criminal career. It appalls me to think what our justice system has done. In 1973, that man sitting right there was sentenced to ten (10) years in the penitentiary. In June of 1973, he went to jail. If he had served ten (10) years in the penitentiary, on June of 1983, he would have still been in jail. And in January of 1983, Karon Pierce would not have been tortured and killed by his knife.
Now, Mr. Gautier wants you to give him sympathy and mercy. Mr. Gautier talks about the case this summer where a little girl was killed and it took seven (7) years to get the death penalty. Seven years. Every court in the land, he went through. Fifty-eight (58) judges, they went through ... to make sure that every single little right of the coddled criminal was taken care of. Why did Jimmy Lee Gray kill again? Kill again? Because they let him out of jail on a life sentence. They paroled him onto the streets so he could commit the crime again.

What did their psychiatrist tell you about him? He has the internal readiness. Dr. Brown, right there .. . had the internal readiness to commit crimes when put in that favoring situation. That man right there will do it again. If you give him life in the penitentiary, there is a chance, as you have seen and and as he has opened the door to tell you, that he will do it again. Do you want a good reason to give him the death penalty? I know of no other reason that I could think of, or that you could think of.
BY MR. GAUTIER: We're going to object, may it please the Court, and ask to make a motion.
BY THE COURT: Send the jury out.
BY MR. GAUTIER: Comes the Defendant and moves the Court to declare a mistrial for the reason ... I would like to state my reason ... that the District Attorney has said that my client, if sentenced to the penitentiary, will be released sometime ... if sentenced to the penitentiary for a life sentence, will be paroled and released, and this is highly improper. I have talked about life sentences. I have not said at any time, send him up there to spend his entire life. I have said give him a life sentence. Time after time, I have been careful to say "life sentence." Not send him up there for every day of his life, but give him a life sentence. He has mentioned the possibility of parole. Prior to that, another case was discussed. The District Attorney got into that case further, but as he well knows, that was an Arizona case where the parole took place. Now, he has taken that case to decide that they parole people out of Mississippi and started talking about parole in this case ... and that's grounds for a mistrial.
BY THE COURT: Alright, Mr. Gautier, let me say this, that I think that it was a serious mistake for you to ever mention the Jimmy Lee Gray case. However, you have chosen to mention that case, and I find it difficult, once you open the door, to restrain the State. I have no doubt that as time goes on, should this case result in a death penalty. I have no doubt that one of the many judges who will review this case will find many, many reasons to consider whether or not your client received a fair trial. But this Court does not believe that defense attorneys should be allowed to interject improper argument before a jury and then, once opening that door for the State to take up that challenge and continue that argument, that they should then be restrained. If this be error, it will be pointed out to me in years to *796 come. Your motion is overruled. (Emphasis added).

PAROLE
Williams contends that the possibility of his being paroled is irrelevant to a proper sentencing determination. Mississippi Code Annotated, § 99-19-101 (1972), as Amended. Williams further argues that the statute which provides for parole eligibility is not properly the subject of juror deliberation, citing Williams v. State, 445 So.2d 798, 813 (Miss. 1984), and Johnson v. State, 416 So.2d 383, 392 (Miss. 1982). Mississippi Code Annotated, § 99-19-105(3)(a) (1972), as Amended, proscribes arbitrary factors in capital sentencing, but the argument here is that parole is discretionary. However, the juror consideration of the possibility of parole is purely speculative, and therefore, an introduction of an arbitrary factor into the sentencing process.
The district attorney did make an argument that the possibility of release on parole was a reason for imposing the death penalty when he stated:
That man right there will do it again. If you give him life in the penitentiary, there is a chance, as you have seen and as he has opened the door to tell you, that he will do it again. Do you want a good reason to give him the death penalty? I know of no other reason that I could think of, or that you could think of.
Williams argues that this is an appeal to the jurors to disregard the sentencing guidelines of the statute and to rely instead upon factors which are proscribed by Section 99-19-105(3)(a).
The prosecution contends that the remarks were invited, and therefore, correct under the authority of Caldwell v. State, 443 So.2d 806 (Miss. 1983), and California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).
The prosecution argues that this case is different from Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because in Caldwell the prosecution's remarks were misleading and incorrect. The State relies upon Justice O'Connor's concurrence in Caldwell, and contends that the giving of non-misleading and accurate information does not violate any federal prohibition since such information is relevant to the sentencing decision. Caldwell, 472 U.S. at 341, 105 S.Ct. at 2646, 86 L.Ed.2d at 247.
The prosecution further argues that defense counsel invited the district attorney's remarks by a statement that he made on voir dire which misrepresented the nature of the life sentence as follows:
If you find him guilty of capital murder, then we go into the second phase in which we talk about making the decision whether he should be sentenced to the penitentiary for his life, a term of his life, or whether he should be sentenced to execution in the gas chamber.
The prosecution also argues that instruction D-4 which was refused misrepresented the nature of a life sentence.
Finally the State contends that the brutality of the crime coupled with the lack of mitigating evidence produced the jury's verdict and asks this Court to affirm the sentencing phase.
On this record there is disagreement about which party introduced the Jimmy Lee Gray case. It appears that defense counsel was emphasizing the jury's responsibility in capital sentencing trials by stating that the district attorney had urged a previous death sentence be carried out since the jury had made the decision. The district attorney "objected" only to argue that the door had been opened. It was during this "objection" that the Jimmy Lee Gray case was first mentioned by name. During argument defense counsel mentioned the case only in connection with the jury's responsibility in capital sentencing.
The gist of the opened door argument which is made by the State is that defense counsel invited the prosecutor's argument, which had the door not been opened, would have been improper. A reading of the exchange which took place in the courtroom reveals that the prosecutor's argument did not address defense counsel's remark which had supposedly invited the "response." If the prosecution's argument is *797 to be accepted, defense counsel's allusion to the Jimmy Lee Gray case somehow "opened the door" for the prosecutor to discuss the possibility of parole and the fact that Jimmy Lee Gray had received a life sentence and had been paroled when he committed his murder.
Whatever viability the opened door doctrine retains in the wake of Caldwell v. Mississippi, supra, defense counsel's argument cannot be fairly read to invite a discussion of the possibility of parole and additional murders. In Caldwell v. State, supra, an equally divided court affirmed a death sentence holding that defense counsel's argument which misrepresented the nature of a life sentence, invited the district attorney to comment on appellate review of death sentences. Caldwell v. State, 443 So.2d at 813, 814. The United States Supreme Court reversed the affirmance, holding that the prosecution may not lessen the jury's sense of responsibility by arguing that death sentences are automatically reviewed, and finding "no rational link" between defense counsel's argument and the prosecutor's response. Caldwell v. Mississippi, 472 U.S. at 337, 105 S.Ct. at 2644, 86 L.Ed.2d at 244. In this case also there is no rational link between defense counsel's argument and the prosecutor's response regarding the possibility of parole.
Recently in Booker v. State, 511 So.2d 1329 (Miss. 1987), this Court addressed the invited error doctrine. Booker had been remanded by the U.S. Supreme Court for further consideration in light of Caldwell v. Mississippi, supra. See Booker v. Mississippi, 472 U.S. 1023, 105 S.Ct. 3493, 87 L.Ed.2d 626 (1985). Discussing the consideration of such assignments we stated:
In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.
Booker, 511 So.2d at 1331.
When we affirmed the death sentence imposed in Booker, we relied on the United States Supreme Court's decision in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). In Young, that court had relied on the invited error doctrine in declining to reverse the conviction.
The salient difference between Caldwell v. Mississippi and United States v. Young is that in Caldwell, the prosecutor's argument was neither responsive nor rationally linked to defense counsel's remarks. Here, as in Caldwell, no rational link exists between the argument and the response.
In Booker, 511 So.2d 1329 (Miss. 1987), we addressed, on the merits, only the prosecutor's closing argument, in which he discussed appellate review of capital sentences. Booker, 511 So.2d at 1331. Since defense counsel had first argued to the jury that the death penalty was costly and involved "one appeal after another," we held that the prosecutor's comments were "invited." Booker, 511 So.2d at 1331, 1332. Our holding in Booker, supra, represented a guarded application of the invited error doctrine. We said, "Prosecutorial comments which under normal circumstances would constitute error do not when the statements merely reiterate statements of defense counsel." Booker, 511 So.2d at 1332, citing Burns v. State, 438 So.2d 1347 (Miss. 1983). Unlike Booker, in this case, the prosecutor's argument is not merely a reiteration of issues raised by defense counsel. Since the discussion of the possibility of parole was not "invited" by defense counsel's remarks the "opened door/invited error doctrine" has no application in this case.
In spite of the holding of United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), Caldwell v. Mississippi, still casts doubt on the viability of the opened door/invited error doctrine in the context of a capital sentencing trial. The Caldwell v. Mississippi holding is rooted in the Eighth Amendment and the majority opinion in that case cautions that "such *798 comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding so as to violate the Eighth Amendment." Caldwell v. Mississippi, 472 U.S. at 340, 105 S.Ct. at 2645, 86 L.Ed.2d at 246. The court has often cautioned that "death is different" and this may be one context in which this is so.
The prosecution is correct in maintaining that the mention of a possibility of parole during a capital sentencing trial is not proscribed by federal law. See California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). There is no doubt, however, that such argument is proscribed by this Court's holdings in Williams v. State, 445 So.2d 798 (Miss. 1984), and Wiley v. State, 449 So.2d 756, 761 (Miss. 1984). In Wiley, supra, this Court, speaking through Justice Dan Lee addressed the holding in California v. Ramos, and said:
This holding was a cautious one in that it addressed only the commutation issue and, more importantly, expressly reserved to the individual states the right to determine what post-sentencing matters are properly placed before a jury. Therefore, the Ramos decision provides us no guidance other than pointing to the direction of the forest; we are free to choose our own path.
Wiley, 449 So.2d at 761-62.
In Williams, supra, we squarely addressed the question of whether a capital sentencing jury may be informed of the possibility of parole. Speaking for the court Justice Prather stated:
A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Mississippi Code Annotated, Section 47-7-3(1) (Supp. 1982). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. Johnson v. State, 416 So.2d 383, 392 (Miss. 1982).
Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, 677 (1979); Davis v. State, 429 So.2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).
Williams, 445 So.2d at 813.
In Williams, we reviewed a jury's imposition of the death penalty pursuant to Section 99-19-105, Mississippi Code Annotated (Supp. 1982) (see Appendix B) and reversed the judgment, stating:
... we hold that on the record before us there is the substantial possibility that the sentence of death was imposed under the influence of passion, prejudice and other arbitrary factors. Mississippi Code Annotated, Section 99-19-105(3)(a) (Supp. 1982). This influence we find in a combined consideration of the three errors of: (1) appellate review (b) possibility of parole, and (c) comment on Williams' failure to testify.
Williams, 445 So.2d at 814.
The prosecution argues that the case today was tried before we announced our holding in Williams, supra. While this is true, it may not be relevant. In Williams, we found that the discussion of parole coupled with the arguments regarding appellate review and Williams' failure to testify introduced factors proscribed by Section *799 XX-XX-XXX(3)(a) (Supp. 1982), into the sentencing phase of the trial. The statute states, in pertinent part:
§ 99-19-105. Review by supreme court of imposition of death penalty.
(3) With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
Section 99-19-105(3)(a), Mississippi Code Annotated (Supp. 1982).
We are bound by statute to conduct a similar inquiry in the case at hand.
The prosecutor's argument regarding the possibility of parole was error. Our holding in Williams, supra, requires that the argument regarding parole be considered as an influence which is proscribed by Section 99-19-105(3)(a). The prosecutor's argument regarding the possibility of Williams being paroled and the fact that Jimmy Lee Gray committed murder after being paroled from a life sentence constituted reversible error in the sentencing phase.

APPELLATE REVIEW
In addition to its lengthy argument about parole, the prosecutor also mentioned appellate review of capital sentences:
In Jimmy Lee Gray's case] it took seven years to get the death penalty. Seven years. Every court in the land he went through. Fifty eight judges, they went through ... to make sure that every single little right of the coddled criminal was taken care of.
Defense counsel objected to this closing argument and moved for a mistrial. The objection was directed at the prosecutor's lengthy argument about the possibility of parole. No mention was made of the district attorney's reference to appellate review.
The prosecution, therefore, contends that this issue is waived for want of a contemporaneous objection. Booker v. State, 449 So.2d 209 (Miss. 1984); and Hill v. State, 432 So.2d 427 (Miss. 1983).
Defense counsel argues that the improper reference to appellate review was interwoven with the objectionable statements concerning the possibility of parole and therefore the contemporaneous objection should cover both points. He further contends that the invocation of the procedural bar would, in this context, be unjust and unreasonable. Williams also argues that we have consistently relaxed our contemporaneous objection rule in capital cases. Voyles v. State, 362 So.2d 1236 (Miss. 1978); Culberson v. State. 379 So.2d 499, 506 (Miss. 1980), and Williams v. State, 445 So.2d 798, 810 (Miss. 1984).
Faced with an analogous situation in Williams, supra, we stated:
We have long held that unwarranted and improper remarks of a district attorney would warrant reversal where there was a "most extreme and intolerable abuse of his privilege," even without defendant attorney's objection. Cartwright v. State, 71 Miss. 82, 14 So. 526 (1893); Powers v. State, 83 Miss. 691, 36 So. 6 (1904); Regan v. State, 87 Miss. 422, 39 So. 1002 (1906); Rufkin v. State, 134 Miss. 116, 98 So. 455 (1924).
Williams, 445 So.2d at 810.
We conclude that although the objection did not specifically address the prosecutor's mention of appellate review, that the argument regarding appellate review and the possibility of parole were so interwoven that the single objection at trial properly preserved both errors. Our heightened review of death sentences bolsters this conclusion. See Williams v. State, 445 So.2d 798, 810 (Miss. 1984) (reversing death sentence in spite of lack of contemporaneous objection); but see, Booker v. State, 511 So.2d 1329 (Miss. 1987) (consideration of prosecutor's remarks during voir dire barred by lack of contemporaneous objection); Hill v. State, 432 So.2d 427 (Miss. 1983) (consideration of prosecutor's improper argument during capital case procedurally barred).
The Eighth Amendment requires that this Court consider the prosecutor's argument concerning appellate review on the merits. In Caldwell v. Mississippi, supra, *800 the court addressed a similar argument and stated, "Such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." Caldwell v. Mississippi, 472 U.S. at 340, 105 S.Ct. at 2645, 86 L.Ed.2d at 246.
In Caldwell v. State, 443 So.2d 806 (Miss. 1983), an equally divided court affirmed the death sentence in spite of the fact that the district attorney had argued to the jury that their's was not the "final decision." In Caldwell a contemporaneous objection had been made to the argument, but the error was not raised on appeal. This Court considered the issue sua sponte. Caldwell, 443 So.2d at 813.
In Williams v. State, supra, we squarely addressed the question of whether appellate review could be mentioned to a capital sentencing jury and held that the mention of appellate review was impermissible. The language of that opinion is instructive:
The structure of the capital sentencing system enacted by our Legislature places the entire sentencing burden on the jury. No judge or other official within our system has the power to impose the sentence of death; only the jury. Therefore, if under our system the capital sentencing jurors are allowed to consider or speculate that any death verdict they may return may later be vacated on appellate review can only have the effect of lessening the sense of responsibility our law has devolved upon them.
Sentencing a citizen to death is the responsibility vested by law in our juries. Any matter presented to such jurors which would allow them to shift their awesome responsibility to others is simply contrary to our law. That we have limited powers of appellate review in no way changes the fact that the primary and ultimate sentencing power is vested alone in the jury. We hold, therefore, that no argument may be made to the jury regarding appellate review or any other matter which might reasonably be expected to cause a juror to consider that he or she shares with anyone other than his or her eleven fellow jurors the responsibility of determining whether the defendant will be sentenced to death.

We have held this reversible error in a non-capital case, Howell v. State, supra. It follows, under the premises outlined at the beginning of our consideration of the sentencing phase, that such is surely error in a death penalty case.
A related point need also be made clear. The defendant does not "invite" comment on appellate review by reminding the jury that it is the legally constituted authority for deciding whether the defendant will live or die. Within the structure of our capital sentencing system, the jury does in fact and in law decide whether the defendant lives or dies. Both prosecutors and defense counsel in final argument to the jury at the sentencing phase should focus on the decision the jury is charged by law with making  whether the defendant will live or die. (Emphasis added).
Williams, 445 So.2d at 811-12.
The prosecution argues that this case was tried before our decision in Williams, and in reliance upon our opinion in Caldwell, supra. We addressed a similar argument in Williams and rejected it, noting that Caldwell was distinguishable in that:
(a) the appellate review point was the only error at sentencing, where here it is combined with two others;
(b) the point was not assigned as error on appeal, while here it was;
(c) in any event, it is not appropriate for a four-four decision as in Caldwell to establish precedent in the law on an important issue in capital murder litigation.
Williams, 445 So.2d at 812.
Also in this case the argument concerning appellate review is coupled with an argument concerning the possibility of parole, two separate and distinct violations by the prosecution.
The prosecution was not without notice that his argument concerning appellate review was impermissible, as it had been condemned in Howell v. State, 411 So.2d 772 (Miss. 1982), which was a non-capital case. Also, Hill v. State, 432 So.2d 427 *801 (Miss. 1983), had been published for a number of months before this trial. In Hill, we stated:
Any argument by the state which distorts or minimizes this solemn obligation and responsibility of the jury is serious error. Every attorney knows the jury verdict is indeed the last word on a factual dispute. Neither the circuit judge nor this Court is authorized to set aside a jury verdict on conflicting evidence, or a disputed factual issue. Moreover, in a death penalty case a jury should never be given false comfort that any decision they make will, or can be, corrected.
In Howell v. State, 411 So.2d 772 (Miss. 1982), which was not a death penalty case, we condemned a "last word" argument.

A prosecutor making this sort of argument is asking for a mistrial. (Emphasis added).
Hill, 432 So.2d at 439.
Here as in Williams, the prosecutor mentioned appellate review at his peril.
Caldwell v. Mississippi, supra, established that it is impermissible, as a matter of federal law, to lessen a capital sentencing jury's sense of responsibility by leaving them to erroneously believe that "theirs is not the final word." As the dissenting opinion in Caldwell v. State, stated, "There is no appellate mercy. Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die." Caldwell v. State, 443 So.2d at 815, 817.
The majority opinion in Caldwell v. Mississippi, held that the prosecutor's remarks were impermissible, stating:
This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated.
Caldwell v. Mississippi, 472 U.S. at 341, 105 S.Ct. at 2646, 86 L.Ed.2d at 247.
The State contends that the argument in this case was not misleading, as the argument was in Caldwell. In Caldwell v. Mississippi, Justice O'Connor concurred with all the majority opinion except that portion which characterized information regarding appellate review as "wholly irrelevant to the determination of the appropriate sentence." Caldwell v. Mississippi, 472 U.S. at 342, 105 S.Ct. at 2646, 86 L.Ed.2d at 248. The State argues that "this concurrence represented the vote of the majority of the court on this point." This contention appears specious. The majority opinion in Caldwell v. Mississippi was written by Justice Marshall. However, Part IV(A) of his opinion, which would hold that any information regarding appellate review of death sentences is irrelevant, represents the opinion of only four justices, since Justice O'Connor declined to join in that portion of the opinion. This does not somehow transform Justice O'Connor's lone concurrence into a majority opinion. Although it could be said that hers was the deciding vote  it cannot be said that her concurrence was the majority opinion.
But regardless of that discussion and whether or not the argument of appellate review was misleading, this Court's holdings forbid the mention of appellate review outright. In Wiley v. State, 449 So.2d 756 (Miss. 1984), we stated:
The path chosen as the law of this state is the one, which, in our opinion, will prove to lead most directly to a fair determination on the issue of sentencing. Our course was set in Howell v. State, 411 So.2d 772 (Miss. 1982), wherein we held that a prosecutor's argument which informed the jury that their verdict was subject to a right of appeal constituted reversible error. The rationale of the Howell decision is designed to secure the *802 individual juror's sense of responsibility for the fate of the accused.
* * * * * *
Any argument by the state which distorts or minimizes this solemn obligation and responsibility of the jury is serious error.
* * * * * *

Because of the importance of the jurors' deliberations we must be cautious in avoiding any actions which tend to reduce the jurors' sense of responsibility for their decision. They must not be permitted to look down the road for someone to pass the buck to. Arguments by a prosecutor which relate the reviewability of a jury's verdict have exactly this dangerous effect. Jurors faced with the portentous duty of deciding an accused's fate will take comfort in the fact of review. They may view their role as merely advisory, a view that can prove fatal to an accused.
* * * All notions of justice require that the jurors as individuals, and a body, recognize and appreciate the gravity of their role. (Emphasis added).
Wiley, 449 So.2d at 762.
Therefore the prosecutor's mention of appellate review constituted reversible error in the sentencing phase. On the question of appellate review this case is distinguishable from Booker v. State, 511 So.2d 1329 (Miss. 1987), because here defense counsel did not open the door by bringing up the subject of appellate review. Furthermore, the prosecutor's insinuation that capital murderers monopolize judicial resources and are coddled by appellate courts may have introduced yet another arbitrary factor proscribed by Section 99-19-105, Mississippi Code Annotated (Supp. 1982).
We conclude then that the prosecutor's argument about the possibility of parole constitutes reversible error in the sentence phase. Furthermore, that the prosecutor's mention of appellate review might well have lessened the jurors' sense of responsibility and therefore constituted reversible error. The State's opened door/invited error argument is without merit since defense counsel mentioned neither the possibility of parole nor appellate review and at the very least this cause should be reversed and remanded for a new sentencing trial.
We are of the opinion that the petition for rehearing should be, and it is, hereby granted as to Assignment of Error VII.
REVERSED AND REMANDED FOR A NEW TRIAL ON THE SENTENCING PHASE.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON and ANDERSON, JJ., concur.
PITTMAN and BLASS, JJ., not participating.